No. 104,858

STATE OF KANSAS, *Appellee*, v. JEROME CHEEKS, *Appellant*.
(310 P.3d 346)

Opinion filed October 4, 2013.

*Paul M. Dent*, of Kansas City, argued the cause and was on the brief for appellant.

*Jerome A. Gorman*, district attorney, argued the cause, and *Derek Schmidt*, attorney general, was with him on the brief for appellee.

The opinion of the court was delivered by

MORITZ, J.: Jerome Cheeks appeals the district court's denial of his petition for postconviction DNA testing of evidence related to his second-degree murder conviction. The district court denied his request because the relevant statute, K.S.A. 21-2512, does not include individuals convicted of second-degree murder among those permitted to seek such testing. Cheeks argues K.S.A. 21-2512 violates the Equal Protection Clause of the Fourteenth Amendment to the United States Constitution because it permits individuals convicted of first-degree murder and sentenced to life imprisonment to petition for DNA testing but denies that opportunity to similarly situated individuals like himself who were convicted of second-degree murder and also sentenced to life in prison. He further asserts he has a right to DNA testing under the Fifth Amendment to the United States Constitution regardless of the scope of K.S.A. 21-2512.

We do not address Cheeks' Fifth Amendment argument because we hold K.S.A. 21-2512 violates the Fourteenth Amendment's Equal Protection Clause in that it treats similarly situated individuals differently with no rational basis for doing so. But rather than strike the entirety of the statute, we elect to reform K.S.A. 21-2512 to include persons similar to Cheeks, and we remand to the district court for proceedings consistent with this opinion.

## FACTUAL AND PROCEDURAL BACKGROUND

In 1993, a jury convicted Cheeks of malicious second-degree murder, and the district court sentenced him to the maximum possible penalty of 15 years to life imprisonment under the sentencing scheme in place prior to the implementation of the Kansas Sentencing Guidelines Act (KSGA), K.S.A. 21-4701 *et seq. State v. Cheeks*, 258 Kan. 581, 908 P.2d 175 (1995). In two separate appeals, this court affirmed Cheeks' conviction and sentence. See *State v. Cheeks*, 280 Kan. 373, 374, 121 P.3d 989 (2005) (rejecting motion to correct illegal sentence); *Cheeks*, 258 Kan. at 595 (affirming conviction).

More than a decade after his conviction, Cheeks filed a pro se petition pursuant to K.S.A. 21-2512, seeking DNA testing of ma-

terial collected from the crime scene. Cheeks' petition listed approximately 30 items to be tested, including hair and blood found at the scene and samples taken from the victim's person and clothing. The district court summarily denied Cheeks' petition because the plain language of K.S.A. 21-2512 permits only individuals convicted of first-degree murder and rape to petition for DNA testing. Cheeks appealed.

## DISCUSSION

Cheeks asserts two challenges to the constitutionality of Kansas' postconviction DNA testing scheme. First, he argues K.S.A. 21-2512 violates the Fourteenth Amendment's Equal Protection Clause because the statute treats similarly situated individuals differently with no justification for such differing treatment. Next, he contends that regardless of the scope of K.S.A. 21-2512, he has a Fifth Amendment procedural due process right to postconviction DNA testing, and the district court's denial of his petition for testing violated that right. Because we conclude K.S.A. 21-2512 violates the Equal Protection Clause, we decline to address Cheeks' Fifth Amendment challenge. See *Wilson v. Sebelius*, 276 Kan. 87, 91, 72 P.3d 553 (2003) (stating, "[a]ppellate courts generally avoid making unnecessary constitutional decisions").

*K.S.A. 21-2512 violates the Equal Protection Clause of the Fourteenth Amendment by denying access to postconviction DNA testing to individuals convicted of second-degree murder and sentenced to life in prison.*

The Fourteenth Amendment's Equal Protection Clause provides that "[n]o state shall . . . deny to any person within its jurisdiction the equal protection of the laws." Cheeks argues K.S.A. 21-2512 denies him equal protection of the law by restricting his access to postconviction DNA testing based on his conviction of second-degree murder. Cheeks contends he belongs to a class of persons who received a preguidelines sentence of life imprisonment for murder and, unlike individuals serving life sentences for first-degree murder, the statute denies him, without justification, the ability to petition for postconviction DNA testing.

On its face, K.S.A. 21-2512 permits only those convicted of first-degree murder or rape the opportunity to petition for postconviction DNA testing. The statute provides in relevant part:

"(a) Notwithstanding any other provision of law, a person in state custody, at any time after conviction for murder as defined in K.S.A. 21-3401, and amendments thereto, or for rape as defined by K.S.A. 21-3502, and amendments thereto, may petition the court that entered the judgment for forensic DNA testing (deoxyribonucleic acid testing) of any biological material that:
(1) Is related to the investigation or prosecution that resulted in conviction;
(2) is in the actual or constructive possession of the state; and
(3) was not previously subjected to DNA testing, or can be subjected to retesting with new DNA techniques that provide a reasonable likelihood of more accurate and probative results." K.S.A. 21-2512.

Before considering Cheeks' constitutional challenge, we pause to clarify the procedural stature of this case. Because the district court summarily rejected Cheeks' petition based on the face of the statute, the court made no findings regarding the three statutory requirements of K.S.A. 21-2512(a). Therefore, if Cheeks prevails on his equal protection challenge before this court and we extend the statute as Cheeks suggests, he will be entitled to a remand to the district court for a hearing to determine whether he can establish those statutory requirements.

We engage in a de novo review of the constitutionality of a statute. *Downtown Bar and Grill v. State*, 294 Kan. 188, 191-92, 273 P.3d 709 (2012). Our review requires us to presume the statute is constitutional and resolve all doubts in favor of upholding the legislation. *Board of Miami County Comm'rs v. Kanza Rail-Trails Conservancy, Inc.*, 292 Kan. 285, 315, 255 P.3d 1186 (2011). A party challenging the constitutionality of a statute bears a " 'weighty' " burden. *Downtown Bar*, 294 Kan. at 192 (citing *Steffes v. City of Lawrence*, 284 Kan. 380, 388, 160 P.3d 843 [2007]).

Courts employ a three-step process in reviewing an equal protection challenge. First, we consider whether the legislation creates a classification resulting in different treatment of similarly situated individuals. *Downtown Bar*, 294 Kan. at 192. Second, if the statute does treat "arguably indistinguishable" individuals differently, then we examine the nature of the classification or right at issue to de-

termine the appropriate level of scrutiny. *Miami County*, 292 Kan. at 315-16. Finally, we apply the appropriate level of scrutiny to the statute. *Downtown Bar*, 294 Kan. at 193.

> *Cheeks' sentence to the maximum penalty for second-degree murder makes him similarly situated to individuals convicted of first-degree murder and given the same sentence.*

The Equal Protection Clause requires that states treat "similarly situated" individuals similarly. *Engquist v. Oregon Dept. of Agriculture*, 553 U.S. 591, 602, 128 S. Ct. 2146, 170 L. Ed. 2d 975 (2008); see *In re Tax Appeal of Weisgerber*, 285 Kan. 98, 106, 169 P.3d 321 (2007) (statute which treats arguably indistinguishable classes of people differently implicates Equal Protection Clause). The party challenging a law's constitutionality has the burden to prove the person is similarly situated to members of a class receiving different treatment, and in conducting our review, we are limited "by the distinctions argued by the complaining party." *State v. Salas*, 289 Kan. 245, 249, 210 P.3d 635 (2009). Determining whether individuals are similarly situated is "not always susceptible to ease of application." *In re Weisgerber*, 285 Kan. at 106.

Here, Cheeks defines the parameters of his class narrowly, advocating that individuals sentenced before the effective date of the KSGA to the maximum penalty of life imprisonment for second-degree murder are similarly situated to individuals sentenced pre-KSGA to life imprisonment for first-degree murder.

The State contends this court previously rejected Cheeks' equal protection challenge in *Salas*. There, this court considered a challenge to the constitutionality of K.S.A. 21-2512 and concluded based on the elements of the crimes that an individual convicted of second-degree murder is not similarly situated to an individual convicted of first-degree premeditated murder. 289 Kan. at 251.

As Cheeks points out, however, the defendant in *Salas* focused on the similarity of the elements of the crimes rather than the punishment imposed. Consequently, the court in *Salas* focused on the "very narrow issue" of whether the premeditation required to prove first-degree murder distinguished individuals convicted of premeditated first-degree murder from individuals convicted of in-

tentional second-degree murder. 289 Kan. at 246. This court concluded that K.S.A. 21-2512 did not violate the Constitution, because premeditation is the " 'defining element' " of premeditated first-degree murder and, therefore, individuals who commit first-degree murder and act with premeditation are not similarly situated to those convicted of second-degree murder. 289 Kan. at 250-51 (quoting *State v. Cook*, 286 Kan. 1098, 1101, 191 P.3d 294 [2008]).

We agree with Cheeks that while our decision in *Salas* foreclosed an equal protection challenge to the statute based on the elements of first- and second-degree murder, it left open the possibility of an equal protection challenge based on the punishment imposed for those two crimes. Moreover, Cheeks' approach adheres to our precedent, which dictates that the complaining party outlines the distinctions that guide an equal protection review. See *Salas*, 289 Kan. at 249. In short, because Cheeks frames his "similarly situated" analysis on the punishment imposed for the crime—not the elements of the crime or the conduct that violates those elements—*Salas* does not control our decision in this case.

Further, by focusing on the punishment imposed for the two crimes, Cheeks directs our attention to the purpose of the law—the proper focus of a similarly situated inquiry. See, *e.g.*, *People v. Hofsheier*, 37 Cal. 4th 1185, 1199-2000, 39 Cal. Rptr. 3d 821, 129 P.3d 29 (2006) (noting that inquiry is not " 'whether persons are similarly situated for all purposes, but "whether they are similarly situated for purposes of the law challenged" ' "); *Dallman v. Ritter*, 225 P.3d 610, 634 (Colo. 2010) (en banc) (pointing out that any law that could demonstrate facial difference could pass constitutional muster if similarly situated inquiry was not "tethered to how persons are affected by the law"); *People v. Warren*, 173 Ill. 2d 348, 361-64, 671 N.E.2d 700 (1996) (discussing traits pertinent to purpose of act).

Unquestionably, K.S.A. 21-2512's purpose is not to punish crimes committed with premeditation. Rather, its purpose is to provide an opportunity for exoneration to innocent individuals convicted of severe crimes. See *State v. Denney*, 278 Kan. 643, 660, 101 P.3d 1257 (2004). Accordingly, the relevant trait for our sim-

ilarly situated analysis is the sentence imposed by the district court and not the elements of the crimes.

Before applying the similarly situated analysis to the specific trait identified by Cheeks, we note the narrow parameters he asserts. Cheeks does not argue that all offenders convicted of second-degree murder are similarly situated to offenders convicted of first-degree murder. Rather, he contends individuals convicted of second-degree murder and sentenced to the maximum sentence of 15 years to life under the indeterminate sentencing scheme existing before the enactment of the KSGA are similarly situated to individuals convicted of first-degree murder and sentenced prior to the KSGA.

Before the sentencing guidelines, offenders convicted of first-degree murder were sentenced to life in prison but were parole eligible after 15 years. See K.S.A. 21-3401 (Ensley 1981) (providing first-degree murder is class A felony); K.S.A. 21-4501 (providing class A felonies received life sentence); K.S.A. 1993 Supp. 22-3717 (providing those convicted of class A felonies, such as first-degree murder were parole eligible after 15 years). Similarly, individuals convicted of second-degree murder were subject to a maximum sentence of 15 years to life. See K.S.A. 21-4501 (punishment for class B felony, such as second-degree murder, was indeterminate sentence of not less than 5 years nor more than 15 years and maximum of not less than 20 years and not more than life). Neither sentence carried the potential for good time credit. See *State v. Carmichael*, 247 Kan. 619, 623, 801 P.2d 1315 (1990). In short, prior to the KSGA, when a district court imposed the maximum sentence of 15 years to life imprisonment for a conviction of second-degree murder, an individual convicted of second-degree murder received the same sentence as an individual convicted of first-degree murder.

Applying the narrow parameters outlined by Cheeks, we hold that individuals sentenced under pre-KSGA indeterminate sentencing provisions to the maximum sentence of 15 years to life for second-degree murder are similarly situated to individuals sentenced pre-KSGA for first-degree murder. Accordingly, we proceed to the second inquiry.

*This court previously rejected the two offered rational bases for K.S.A. 21-2512's differing treatment of similarly situated individuals.*

Having determined Cheeks met the threshold requirement of his equal protection challenge by proving he is similarly situated to a group covered under the statute, we next examine K.S.A. 21-2512 by applying the appropriate level of scrutiny. We previously determined that because K.S.A. 21-2512 does not burden a fundamental right or involve a suspect class, we review the statute applying a rational basis test. See *Denney*, 278 Kan. at 654; see also *Downtown Bar*, 294 Kan. at 194 (noting heightened levels of scrutiny are reserved for legislation that burdens fundamental right or is based on suspect class).

Although the rational basis standard is a "very lenient standard," it is not a "toothless" one. *Downtown Bar*, 294 Kan. at 194-95. Here, Cheeks is burdened with negating " 'every conceivable [reasonable] basis which might support' " the differing treatment. 294 Kan. at 195. But in considering these possible bases, we do not focus on the legislature's actual rationale for the classification. Rather, we consider whether the legislature could have had a legitimate reason for drawing the challenged classification. See 294 Kan. at 195. To pass the rational basis test, the statute must foster legitimate goals and the means chosen to achieve the state's goals must "bear a rational relationship to those goals." *Mudd v. Neosho Memorial Regional Med. Center*, 275 Kan. 187, 198, 62 P.3d 236 (2003). In other words, the proffered rational basis must be more than simply a legitimate legislative goal, the " ' "classification [must] bear[] some reasonable relationship to a valid legislative objective." ' " (Emphasis added.) 275 Kan. at 198 (quoting *Injured Workers of Kansas v. Franklin*, 262 Kan. 840, 847, 942 P.2d 591 [1997]). Put another way, the proffered rational basis must both explain the distinction drawn by the statute between two classes of individuals *and* be a legitimate legislative objective.

Cheeks asserts that neither of the two bases traditionally offered for differing classifications—*i.e.*, the cost and severity of the crime—justify excluding second-degree murder from K.S.A. 21-

2512. We previously resolved this issue in Cheeks' favor in *State v. Denney*, 278 Kan. at 654-56.

Denney was convicted of aggravated criminal sodomy and sought postconviction DNA testing under K.S.A. 21-2512 arguing he was similarly situated to individuals convicted of rape who were permitted to petition for DNA testing under the statute. After reviewing the elements of the two statutes, we concluded Denney's conduct was "arguably indistinguishable" from rape. 278 Kan. at 653-54. Because the conduct prohibited by both statutes was similar—*i.e.*, both statutes prohibit forced penetration of a female bodily orifice by the male sex organ—we concluded that individuals convicted of rape and individuals convicted of aggravated criminal sodomy are similarly situated, and we further held that K.S.A. 21-2512 violates the Equal Protection Clause. 278 Kan. at 656.

In so holding, we specifically rejected the State's suggestion that the cost of testing justified differing treatment for rape and aggravated criminal sodomy with respect to the availability of postconviction DNA testing. 278 Kan. at 654 (citing *Stephenson v. Sugar Creek Packing*, 250 Kan. 768, 780-82, 830 P.2d 41 [1992]).

We also noted in *Denney* that "our own research" had disclosed that the legislature may have intended to allow postconviction DNA testing based upon the severity of the crime. 278 Kan. at 654-55 (quoting Minutes, Sen. Judicial Comm., February 28, 2001, Attach. 6) (describing legislative history indicating legislature intended to " 'provide for a mechanism that persons convicted for the most serious offenses, *i.e.*, murder and rape, could petition the court for post-conviction analysis to be conducted by the KBI' ").

Despite the legislature's intent to distinguish the availability of DNA testing on this basis, we concluded in *Denney* that crime severity level was not a rational basis upon which to provide for postconviction DNA testing for persons convicted of rape but not for persons convicted of aggravated criminal sodomy. We reasoned:

"As we examine the proposed rational basis of crime severity, we observe that aggravated criminal sodomy is, in all cases, a severity level 2 person felony. See K.S.A. 21-3506(c). By contrast, rape by force or fear is a severity level 1 person felony. See K.S.A. 2003 Supp. 21-3502(c). While these differences in severity level could be a rational basis for distinguishing between when DNA testing is allowed

and when not, we also observe that aggravated criminal sodomy has the same severity level, 2, as rape when consent was obtained by 'knowing misrepresentation.' See K.S.A. 2003 Supp. 21-3502(a)(3) and (4). Crimes within each severity level are considered relatively equal in severity. K.S.A. 21-4707(a). However, DNA testing is allowed by statute for convictions of rape but not aggravated criminal sodomy.

"Accordingly, we cannot conclude that crime severity level is a rational basis for the different treatment of these arguably indistinguishable groups." 278 Kan. at 655-56.

Here, the State argues the severity level of the crime justifies the distinction between individuals convicted of first-degree murder and individuals convicted of second-degree murder. But this rationale fails for the same reason it failed in *Denney*. Specifically, the State's argument fails to take into account that the legislature included rape as a crime for which postconviction DNA testing is available. Yet rape is "relatively equal in severity" to second-degree murder, which is not included within the statute. See K.S.A. 2012 Supp. 21-6807(a) (stating "[c]rimes listed within each level are considered to be relatively equal in severity"). When the legislature enacted K.S.A. 21-2512, first-degree murder was classified as an off-grid felony while both rape and second-degree murder were classified as either severity level 1 or severity level 2 felonies. See K.S.A. 21-3401; K.S.A. 21-3502; K.S.A. 21-3402. Similarly, prior to the sentencing guidelines, both second-degree murder and rape were class B felonies. See K.S.A. 21-3402; K.S.A. 21-3502.

We conclude that because second-degree murder and rape are both level 1 or level 2 felonies, the severity of the crime cannot be a rational basis for including rape but omitting second-degree murder from the list of crimes for which postconviction DNA testing is available. See *Denney*, 278 Kan. at 655-56.

Other than cost and severity, Cheeks does not attempt to negate any other potential rationale for the statute's differing treatment. And although not burdened to do so, the State does not advance any other potential rational basis for the statute's distinctions.

Nor can we agree with Justice Biles' dissent that in this case finality of judgment is a legitimate rational basis. While we do not dispute that finality of judgment may be a legitimate legislative objective, here, it fails to explain the distinction drawn in the stat-

ute. We can perceive of no legitimate reason for placing someone convicted of first-degree murder/rape in a different position as to the finality of judgment than someone convicted of second-degree murder.

Likewise, Justice Rosen's dissent also fails to provide a rational basis that explains the distinction drawn here. Contrary to his assertion, it is our concern if the legislature drew a line because of "economics" or experimentation because when those lines are arbitrary they run afoul of the Constitution. See *Denney*, 278 Kan. at 654 (rejecting cost as rational basis); see also *Minnesota v. Clover Leaf Creamery Co.*, 449 U.S. 456, 465-68, 101 S. Ct. 715, 66 L. Ed. 2d 659 (1981) (rejecting equal protection challenge to ban on plastic milk jugs but not cardboard milk jugs because, although law did not tackle entire problem at once, the line legislature drew was rational). We agree that it is the "legislature's prerogative to make policy decisions," but we are tasked with ensuring those decisions are within the parameters of the Constitution. We will not overlook that essential role.

In short, we cannot conceive of any rational basis to explain the legislature's decision to permit individuals convicted of rape and first-degree murder to petition for DNA testing but to deny that same opportunity to individuals convicted of second-degree murder and sentenced to 15 years to life imprisonment. Thus, as we concluded in *Denney*, K.S.A. 21-2512 violates the Equal Protection Clause and is unconstitutional.

*We extend K.S.A. 21-2512 to include offenders in the same situation as Cheeks.*

Finally, we must consider the remedy for the equal protection violation. When a statute fails on equal protection grounds, we may either strike the statute or extend the benefits of the statute to include those improperly omitted. *Denney*, 278 Kan. at 656 (citing *Califano v. Westcott*, 443 U.S. 76, 89, 99 S. Ct. 2655, 61 L. Ed. 2d 382 [1979]). The United States Supreme Court has specified a preference for expanding the law rather than striking down the entire statute. *Heckler v. Mathews*, 465 U.S. 728, 739 n.5, 104 S. Ct. 1387, 79 L. Ed. 2d 646 (1984). However, in considering

whether we should reform or nullify the law, we ultimately consider the legislature's preference—*i.e.*, would the legislature prefer we strike the entire law or expand the law to cover the improperly excluded group? See *Denney*, 278 Kan. at 659-60. Further, in ascertaining the legislature's desire, we consider the purpose of the statute and the statutory scheme. 278 Kan. at 659-60.

In considering the proper remedy in this case, we do not start from scratch. In *Denney*, we also found K.S.A. 21-2512 unconstitutional and considered the remedy for the equal protection violation. Framing the question here as we did in *Denney*, we ask "whether the Kansas Legislature would prefer to have statutes which cover DNA testing" for those convicted of second-degree murder and given the presentencing guidelines maximum penalty of life "or instead to have no statutes providing for postconviction DNA testing." *Denney*, 278 Kan. at 660.

In resolving this question in *Denney*, we thoroughly examined the purpose of the statute as well as the overall statutory scheme and concluded K.S.A. 21-2512 codifies the state's "obvious commitment to exoneration of the innocent through DNA." 278 Kan. at 660; see also Minutes, House Judiciary Comm., March 19, 2001. Further, we held that while K.S.A. 21-2512 is not intimately connected to a broader statutory scheme, supporters of postconviction DNA testing viewed K.S.A. 21-2512 and increased sampling as statutes providing protections for the innocent. See *Denney*, 278 Kan. at 660.

Moreover, we explained the risks of nullifying K.S.A. 21-2512 in *Denney*: "In short, Kansas' obvious commitment to exoneration of the innocent through DNA—both sampling and later testing— would be severely reduced if we nullify [K.S.A. 21-2512]. On the other hand, if we extend the statutory coverage . . . we have increased the chances of freeing the innocent." 278 Kan. at 660.

Finally, we note that proponents of K.S.A. 21-2512 specifically proposed including individuals convicted of second-degree murder among those who would qualify to seek DNA testing. Unfortunately, our research reveals no legislative history regarding the reason the legislature did not extend testing to individuals convicted of second-degree murder and sentenced prior to the guidelines to

15 years to life in prison. Nor can we conceive of any basis for such a distinction.

Further, contrary to the rationale of Chief Justice Nuss' dissent, we do not find the legislature's decision to omit coverage under K.S.A. 21-2512 for individuals with second-degree murder convictions to be determinative of whether to reform or nullify K.S.A. 21-2512. While the dissent characterizes our decision to nullify the statute in *State v. Marsh*, 278 Kan. 520, 102 P.3d 445 (2004), *rev'd* 548 U.S. 163, 126 S. Ct. 2516, 165 L. Ed. 2d 429 (2006), as a "salient parallel" and "directly analogous," we find *Marsh* distinguishable for two reasons.

First, the issue presented here is entirely distinct from the issue presented in *Marsh*. In *Marsh*, we rejected the notion that this court should "interpret" an otherwise unambiguous statute in a manner conflicting with both the plain language of the statute and the legislative history. 278 Kan. at 537-41. Here, in contrast, we are not asked what the legislature said or what it meant to say. Rather, we are faced with a different quandary—*i.e.*, given that the statute cannot be enforced as written, would the legislature prefer expansion of the statute to include DNA testing for certain individuals convicted of second-degree murder, or would it prefer no statute at all?

Given that question, we see nothing in the legislative history of K.S.A. 21-2512 that would signal that the legislature was so opposed to postconviction DNA testing for certain individuals convicted of second-degree murder that it would choose to forego its honorable goals of exonerating the innocent rather than include the class challenged here.

Second, the constitutional violation at issue here is distinct from the constitutional issue in *Marsh*. The *Marsh* court found that the statute at issue violated the Eighth Amendment's prohibition on cruel and unusual punishment. 278 Kan. at 534-35. We have found no caselaw suggesting that when a statute violates the Eighth Amendment and the offending provision cannot be severed, a court may simply reform the statute. Moreover, reformation certainly was not an available remedy in *Marsh*. In contrast, we are faced here with an Equal Protection violation—a circumstance in which

courts have reformed statutes rather than nullify them. See *Califano*, 443 U.S. at 89-90 (noting that in previous equal protection challenges to federal benefit law, underinclusive statutes have been extended rather than nullified); *State v. Limon*, 280 Kan. 275, Syl. ¶ 2, 122 P.3d 22 (2005) (striking language causing statute to violate the Equal Protection Clause).

In sum, while the legislature's omission of second-degree murder may indicate that if the legislature was writing K.S.A. 21-2512 in a vacuum, it would prefer not to include second-degree murder, it does not answer the question presented here. And in light of the statute's worthy purpose, and the legislature's clear focus on that purpose, we conclude the legislature would prefer we reform the statute to include offenders like Cheeks, rather than strike it altogether. In so holding, we note that unlike *Denney*, which added a new crime to the statute's coverage, our expansion of the statute in this case covers a much narrower class of offenders, *i.e.*, individuals convicted of second-degree murder and sentenced before the effective date of the KSGA to the maximum penalty of 15 years to life imprisonment.

We reverse the district court's ruling denying Cheeks' petition and remand this case to the district court to determine whether Cheeks satisfied the remaining statutory requirements entitling him to DNA testing under K.S.A. 21-2512.

※ ※ ※

NUSS, C.J., dissenting: I respectfully dissent from the majority's decision to rewrite K.S.A. 21-2512.

I disagree with these colleagues because the legislative history of the statute establishes that a judicial rewrite to extend postconviction DNA testing to anyone convicted of second-degree murder is "clearly contrary to the legislative intent" and violates the separation of powers doctrine. *State v. Limon*, 280 Kan. 275, 304, 122 P.3d 22 (2005) (discussing *State v. Marsh*, 278 Kan 520, 102 P.3d 445 (2004), *rev'd* 548 U.S. 163, 126. S. Ct. 2516, 165 L. Ed. 2d 429 [2006]). And when the judicial alteration of a statute would be contrary to legislative intent, courts instead *"must* nullify the statute."* (Emphasis added.) *Limon*, 280 Kan. at 304.

The *Marsh* majority opinion is on point. The legislative history of the death penalty statute at issue there (K.S.A. 21-4624[e]) reveals that the attorney general recommended that the death penalty be imposed only if the defendant's aggravating circumstances outweighed the mitigating circumstances and not when they were of equal weight, *i.e.*, in equipoise. That official testified, "Now if they are equal, 'tie' goes to State. We're proposing 'tie' goes to defense." *Marsh*, 278 Kan. at 541 (quoting *State v. Kleypas*, 272 Kan. 894, 1014, 40 P.3d 139 [2001]). But as the *Marsh* court observed, " '[u]nfortunately, the legislature did not follow the attorney general's recommendation.' " 278 Kan. at 541.

The *Marsh* majority refused to write the attorney general's specific recommendation into K.S.A. 21-4624(e) to save the death penalty statute from what it concluded was the legislature's unconstitutional equipoise standard. Instead, the majority nullified the statute, effectively overruling *Kleypas* from 3 years earlier. Its rationale for nullifying instead of rewriting was well summarized by a unanimous *Limon* court less than 1 year later:

> "The [Marsh] majority concluded that the statutory construction adopted in Kleypas was not within the apparent intent of the legislature. The legislative history of the death penalty statute showed that the attorney general had presented the legislature the precise question of whether the equipoise provision was constitutional. The attorney general recommended that the statute provide that the aggravating circumstances must outweigh the mitigating circumstances before a death sentence may be imposed and advised that without this change the constitutionality of the statute was in question. *Despite this specific recommendation and advice, the legislature did not act on the attorney general's advice.* 278 Kan. at 540. *Thus, to read the statute in the manner suggested in Kleypas was contrary to legislative intent.*" (Emphasis added.) 280 Kan. at 304.

The *Limon* court went on to further characterize the rationale and holding in *Marsh*:

> "The *Marsh* court concluded it was a violation of the separation of powers doctrine *for the court to rewrite a statute in a manner so clearly contrary to the legislative intent. The only option in such a situation is to nullify the statute.*" (Emphasis added.) 280 Kan. at 304.

As the *Marsh* court itself had recognized, to " 'adopt[] language exactly the opposite of what the legislature stated' " would " 'in-

vade[] the province of the legislature.' " *Marsh,* 278 Kan. at 540 (quoting *Kleypas,* 272 Kan. at 1124-25 [Davis, J., dissenting]).

The salient parallel between *Marsh* and Cheeks' situation is clearly presented by the legislative history of K.S.A. 21-2512. As we acknowledged in *State v. Denney,* 278 Kan. 643, 655, 101 P.3d 1257 (2004), two assistant attorneys general assigned to the Kansas Bureau of Investigation (KBI) testified before legislative judiciary committees in support of two amendments. The first amendment is relevant to this discussion because in it the KBI recommended postconviction DNA testing generally for "murder and rape."

" 'While those of you involved in the appropriations process realize how limited our resources are in the laboratory, we would like to recommend the adoption of the amendment described in Attachment A, which will provide for a mechanism that persons convicted for *the most serious offenses, i.e., murder and rape,* could petition the court for post-conviction analysis to be conducted by the KBI.' Minutes, Sen. Judiciary Comm., February 28, 2001, Attach. 6; Minutes, House Judiciary Comm., March 19, 2001. (Emphasis added.)" 278 Kan. at 655.

We further acknowledged in *Denney* that the legislature "passed the KBI's recommendation in the form of K.S.A. 2003 Supp. 21-2512, *except it eliminated second-degree murder (K.S.A. 2003 Supp. 21-3402) from the KBI's proposal* . . . [and it] became law." (Emphasis added.) 278 Kan. at 655. Per subsection (a) of K.S.A. 21-2512, postconviction DNA testing for murder was expressly limited by the legislature to "conviction for murder as defined by K.S.A. 21-3401." And only murder in the first degree is defined by 21-3401.

If we are to be consistent and follow the *Marsh* majority's rationale and its nullification of the death penalty statute, then we must also nullify the postconviction DNA testing statute. Directly analogous to *Marsh,* here the legislature rejected the attorney general's particular recommendation to provide testing for all murder convictions. While the legislature affirmatively authorized testing via statutory change, it pointedly included only convictions for first-degree murder—as expressly defined by statute. That narrow category necessarily excluded all second-degree murder convictions. Given this clear expression of legislative intent to confine the statutory protections to first-degree murder, and given that our "task

is to discern what course the legislature would have chosen to follow if it had foreseen our conclusions as to underinclusiveness" for second-degree murder, then the statute must be nullified, not rewritten. *State v. Denney*, 278 Kan. at 657; see *Limon*, 280 Kan. at 304 (when the judicial alteration of a statute would be contrary to legislative intent, courts instead "must nullify the statute").

I acknowledge that in *Denney* we decided not to nullify the unconstitutional statute—K.S.A. 21-2512—that, among other things, authorized DNA testing for those convicted of rape. Rather, we chose to extend its protection to include Denney's situation, *i.e.*, one convicted of aggravated criminal sodomy for penetrating his victims' anuses with his penis. But *Denney* is different from *Marsh*, and by extension *Cheeks*, because the legislature simply had not even addressed, much less rejected, protection for Denney's situation. By contrast, the legislature had addressed, and rejected, Cheeks' situation.

I wrote the opinion for the court in *Denney*. But I cannot join the present majority in extending *Denney* to situations where the legislature has expressed a clear contrary intent.

\* \* \*

ROSEN, J, dissenting: While I am sympathetic to the interests of all wrongfully convicted prisoners in taking advantage of improvements in forensic science to help demonstrate their innocence, three considerations lead me to dissent.

First, principles of constitutional analysis generally support the constitutionality of the statute as drafted. As the majority correctly points out, we must presume that a statute is constitutional and we must resolve all doubts in favor of upholding the legislation. As the majority also correctly notes, the appellant in this case does not belong to a suspect class and does not allege the impingement on a fundamental constitutional right. Furthermore, individuals who have been convicted of crimes after fair trials do not enjoy the presumption of innocence and have a limited liberty interest, which affords a state great flexibility in deciding what postconviction procedures to make available. See *District Attorney's Office for Third Judicial Dist. v. Osborne*, 557 U.S. 52, 68-69, 129 S. Ct. 2308, 174

L. Ed. 2d 38 (2009). A convicted person has no substantive due process right in obtaining DNA evidence to assert actual innocence. *Osborne*, 557 U.S. at 72.

Second, prisoners generally have available to them remedies beyond the state statutory scheme, and the Kansas scheme does not render it impossible for prisoners in Cheeks' situation to obtain relief. Neither the Equal Protection Clause of the Fourteenth Amendment to the United States Constitution nor the counterpart equal protection requirement of the Fifth Amendment to the United States Constitution guarantees absolute equality or precisely equal advantages. In the context of criminal proceedings, the requirements of equal protection mandate only "an adequate opportunity to present [one's] claims fairly . . . ." *United States v. MacCollom*, 426 U.S. 317, 324, 96 S. Ct. 2086, 48 L. Ed. 2d 666 (1976) (quoting *Ross v. Moffitt*, 417 U.S. 600, 616, 94 S. Ct. 2437, 41 L. Ed. 2d 341 [1974]). It has been firmly established that a statutory remedy is not the only relief that a prisoner may pursue in seeking exonerating DNA testing. For example, a convicted state prisoner may seek DNA testing of crime-scene evidence in an action under 42 U.S.C. § 1983 (2006). *Skinner v. Switzer*, 562 U.S. 521, 131 S. Ct. 1289, 1298, 179 L. Ed. 2d 233 (2011); *Durr v. Cordray*, 602 F.3d 731, 736 (6th Cir. 2010); *Garcia v. Sanchez*, 793 F. Supp. 2d 866, 869 (W.D. Tex. 2011). Federal habeas corpus relief may also be available as a remedy. See *Skinner*, 562 U.S. at 534-35; *Osborne*, 557 U.S. at 72, 87; *Green v. Kansas*, No. 12-3003-SAC, 2012 WL 3655314 (D. Kan. 2012) (unpublished opinion); see also *Cunningham v. Dist. Attorney's Office for Escambia*, 592 F.3d 1237 (11th Cir. 2010) (Alabama statute allowing postconviction remedies based on newly discovered evidence could provide access to DNA testing). K.S.A. 21-2512(g) explicitly states that it does not limit the circumstances under which a person may obtain DNA testing under any other provision of law.

Third, it lies within the discretion of the legislature to decide how to allocate the judicial and scientific resources for postconviction relief. Keeping in mind that there is no inherent constitutional right to postconviction DNA testing, the decision of the legislature to set limits on which crimes qualify for that testing reflects a policy

decision that lies outside the scope of this court's review. The *Os-borne* Court rejected such judicial intervention, because establishing a freestanding right to access DNA evidence for testing would force it to act as a policymaker. 557 U.S. at 73-74. The Court stated:

"The availability of technologies not available at trial cannot mean that every criminal conviction, or even every criminal conviction involving biological evidence, is suddenly in doubt. The dilemma is how to harness DNA's power to prove innocence without unnecessarily overthrowing the established system of criminal justice.

"That task belongs primarily to the legislature.

. . . .

". . . The elected governments of the States are actively confronting the challenges DNA technology poses to our criminal justice systems and our traditional notions of finality, as well as the opportunities it affords. To suddenly constitutionalize this area would short-circuit what looks to be a prompt and considered legislative response." 557 U.S. at 62, 72-73.

Given the lack of an inherent right to postconviction DNA testing and given the legislature's prerogative to make policy decisions, I would find that the legislature has the authority to decide which classifications of criminal activity are to be governed by the formal procedures of K.S.A. 21-2512. It is not important to this court whether this legislative judgment was grounded in economics or in a sense that certain crimes are more susceptible to exculpatory evidence or in an interest in experimenting with the procedure before expanding it to other crimes. As Justice Biles notes in his dissenting opinion, finality of judgment may also provide a basis for restricting the statutory scope of postconviction forensic testing. See *People v. Pursley*, 341 Ill. App. 3d 230, 236, 792 N.E.2d 378 (2003) (finality of judgment is legitimate state interest in limiting postconviction forensic remedies).

For these reasons, I would reject Cheeks' constitutional claims. I am also concerned that the majority opinion creates the prospect of unlimited postconviction remedies for all convicted persons. Although the majority appears to limit its decision to others subject to "severe" penalties, it will require judicial contortions to exclude most, if not all, incarcerated felons from the scope of this decision. For example, now a comparison of those who are convicted of rape, but who receive any lesser sentence, or those who were convicted

of Class A crimes such as possession of cocaine are necessarily included. And from there we will have to consider those who are sentenced for less serious crimes but who might be able to utilize DNA evidence to their advantage, or who were convicted of similar crimes, such as drug possession. And finally we may open the door to all sorts of other forensic testing, such as fingerprints, ballistic analysis, and every additional scientific advance in the years to come. Extending statutory procedures to include other crimes, other sentences, and other forensic tests is, in my opinion, a policy matter that is the proper province of the legislature, not the courts.

* * *

BILES, J.: I must dissent from the majority's analysis and outcome. I would hold that a rational basis for the classification at issue in this case is the well-recognized government interest in promoting finality of judgments. See *State v. Chiles*, 260 Kan. 75, 79-80, 917 P.2d 866 (1996); *State v. Delacruz*, 258 Kan. 129, 139, 899 P.2d 1042 (1995). This legitimate interest in my view allows the legislature to select those convictions subject to later DNA testing access and collateral challenge—selections the majority invalidates by deciding for itself how the legislature should have implemented this statute based upon a single consideration: the potential for exonerating wrongfully convicted persons. An equal protection analysis subject to rational basis review " 'is not a license for courts to judge the wisdom, fairness, or logic of legislative choices.' " *Heller v. Doe*, 509 U.S. 312, 319, 113 S. Ct. 2637, 125 L. Ed. 2d 257 (1993).

Put simply, permitting DNA testing access and postconviction collateral challenges based on those testing results to be driven solely by the severity of the punishment imposed expands the statute's expressly stated scope. It is not hard to imagine future cases in which parties will extrapolate the majority's analysis to argue for DNA testing access for any off-grid felony convictions under the present sentencing guidelines. See K.S.A. 2012 Supp. 21-6806(c) (off-grid felonies carry a life sentence). More curiously, this extrapolation is not even a difficult stretch despite the majority's expressed insistence that its decision is limited to "a much narrower

class of offenders, *i.e.*, individuals convicted of second-degree murder and sentenced before the effective date of the [Kansas Sentencing Guidelines Act] to the maximum penalty of 15 years to life imprisonment." Slip op. at 15. Just saying it is so limited, does not make it so.

The majority's logic will soon require our district courts to reexamine a much larger range of convictions than plainly called for by the statute. And the finality of that larger group of convictions will remain an open question while the proceedings drag on from the district court to the appellate courts. Every additional crime eligible for DNA testing access necessarily exposes more convictions to collateral attack. Logic dictates that the smaller the list of crimes that are eligible, the smaller the universe of lawfully convicted potential DNA testing movants. Legislatures draw lines when enacting procedural processes to determine how those processes are used. Our legislature did so in this instance by distinguishing between first-degree murder and rape on one hand, and all other crimes on the other. The majority's invalidation under the rational basis test of the line drawn here is more than application of our well-established principles for that test requires.

I do not believe an equal protection analysis employing the rational basis test requires us to invalidate this statute and then redraft it. I would hold the statute, as drafted, is properly within the legislature's prerogative to balance the variety of legitimate public interests in play, which include the lofty purpose of making available a process for wrongfully convicted persons to access DNA testing and collaterally challenge their convictions and the public interest in finality of lawfully obtained criminal convictions.