NOT DESIGNATED FOR PUBLICATION

No. 126,151

IN THE COURT OF APPEALS OF THE STATE OF KANSAS

STATE OF KANSAS,
*Appellee*,

v.

LUCKY MALONE BAKER,
*Appellant*.

MEMORANDUM OPINION

Appeal from Barton District Court; CAREY L. HIPP, judge. Submitted without oral argument. Opinion filed June 7, 2024. Affirmed.

*Sam Schirer*, of Kansas Appellate Defender Office, for appellant.

*Natalie Chalmers*, assistant solicitor general, and *Kris W. Kobach*, attorney general, for appellee.

Before BRUNS, P.J., HILL, J., and MARY E. CHRISTOPHER, S.J.

PER CURIAM: Lucky Malone Baker entered a guilty plea and was convicted of one count of criminal discharge of a firearm at an occupied dwelling. He now appeals several aspects of his resulting sentence, including the amount of restitution, imposition of BIDS attorney fees, and his offender registration. Based on a review of the issues presented, we affirm the district court's sentencing order.

FACTUAL AND PROCEDURAL HISTORY

In March 2022, the State charged Baker with aiding and abetting in the criminal

1

discharge of a firearm at an occupied dwelling—a severity level 7 person felony—and two counts of criminal damage to property—a severity level 9 nonperson felony. The charges arose from an incident in July 2018 in which Baker allegedly participated in a drive-by shooting, during which a house, camper, ATV, and truck were damaged by gunshots.

In June 2022, Baker agreed to plead guilty to the charge for aiding and abetting in criminal discharge of a firearm at an occupied dwelling. In exchange, the State agreed to dismiss the criminal damage to property charges, dismiss pending charges in another case, and to not revoke a diversion in an unrelated case. Under the plea agreement, Baker acknowledged in a handwritten notation he would have to register as a violent offender for 15 years and that he "[a]gree[d] to restitution as requested." The plea agreement also included a provision stating he understood the court "may require that I pay full restitution and reparations for all personal injury, property loss or damage." The State agreed not to oppose a request for dispositional departure. However, the parties agreed to no durational departure.

The district court accepted Baker's plea after advising him of his rights and confirming he knowingly, voluntarily, and intelligently entered the plea agreement. The only mention of restitution at the plea hearing was the prosecutor stating—without objection—Baker "will pay restitution that is requested." During the plea hearing, the district court asked Baker to "explain to the Court . . . why you think you're guilty on this count," which led to the following inquiry:

> "[Defense Counsel]: Is your name Lucky Malone Baker?
> "MR. BAKER: Yes, it is.
> "[Defense Counsel]: Mr. Baker, is it true, as the information filed March 18th of
> this year in this case says, sometime on the late evening or early morning between July
> 21st, July 22nd, 2018, did you drive a vehicle with some other individuals in it by 1507
> Van Fleet Lane in Great Bend, Barton County, Kansas?

2

"MR. BAKER: Yes.

"[Defense Counsel]: And while you were driving this vehicle, did some of these other individuals discharge a firearm in the direction of the residence located at that night?

"MR. BAKER: Yes.

"[Defense Counsel]: And at the time you were all aware that there were likely individuals inside the residence?

"MR. BAKER: Yes."

The State proffered the probable cause affidavit as the factual basis for Baker's plea. The probable cause affidavit reflected that the driver of the vehicle—Baker, based on his admission at the plea hearing—turned off the vehicle's headlights just before the shooting. The affidavit also stated Brenda Holden, who lived in the house with her son Danyon, reported finding "the back window to her son's 2004 Chevy Silverado broken out." Officers found a "total of 6 different [bullet] entry points . . . from the Chevy Silverado, a 3-wheeler in the bed of the pickup, and the passenger side rear door." Further damage included:

"An entry hole to the paneling of the residence, exiting into the garage and striking a sign. The wooden fence on the northwest corner of the property. A Jayco Jayflight camper which sits up in the front of the residence and to the north of the garage. The bullet entered the front right side of the camper, striking a pillow on the bed."

The affidavit stated that the shooting occurred because of an argument between Baker and Brenda's other son, Braden Jewell, who also lived in the residence. About a year after the incident, Jewell contacted officers to report an altercation with Baker, during which Baker admitted to Jewell he was the driver during the shooting. Baker apologized. He told Jewell the gunshot "wasn't intended to hit the house, only Jewell's truck," "it was supposed to be one bullet to his truck, and the person shooting got carried away."

3

Baker later moved to withdraw his plea before sentencing, claiming he did not understand the consequences of the plea. The district court denied the motion at a hearing, finding Baker failed to show good cause to withdraw his plea.

The district court sentenced Baker in March 2023. The court imposed a presumptive 29-month prison sentence but granted Baker's motion for a dispositional departure to probation for a term of 24 months. Because Baker committed his crime with a deadly weapon, the court ordered him to register as a violent offender for a term of 15 years.

As for attorney fees, defense counsel asked the district to consider waiving BIDS attorney fees "due to the amounts of restitution. Mr. Baker will be owing quite a bit." Defense counsel asked the court to consider waiving the BIDS attorney fees in good faith that Baker would fulfill his other obligations. The court questioned defense counsel and Baker as follows:

> "THE COURT: Let me ask this question. From your standpoint we're talking about 9,000 in restitution. Is there any objection from Mr. Baker with that amount? I'm asking Ms. Farnsworth and then I'll go to Mr. Baker.
> "MS. FARNSWORTH: No, Your Honor. We've had—looked at the receipts. So we are aware that that is the amount.
> "THE COURT: Okay. Do you agree with that, Mr. Baker?
> "MR. BAKER: Yes, Your Honor."

The court ordered Baker to pay $9,066.03 of restitution—$7,566.03 was to go to Farm Bureau, $1,000 to Danyon Holden, and $500 to Braden Jewell. After Baker personally confirmed that he could make the monthly restitution payments of $377, the district court asked Baker about employment. Baker stated he "work[ed] for Midwest Tent Rentals in fairs during the summertime [and] during wintertime I do side jobs as I

4

can." In response, the court ordered attorney fees "but reduce[d] it a little bit here." Thus, the court ordered Baker to pay $500 for attorney fees plus the $100 BIDS application fee.

Baker timely appealed.

ANALYSIS

I. *Did the district court err in ordering Baker to pay restitution?*

Baker challenges the restitution order, arguing the district court erred by imposing restitution for damages that were not caused by his crime of conviction. Although he acknowledged agreeing to pay restitution in his plea agreement and at sentencing, Baker now contends the court erred by requiring him to pay for damages attributable to the dismissed criminal damage to property charges. In short, Lucky concedes he must pay restitution for damages to the residence but disputes the restitution for the damages to the truck, ATV, and camper.

The State responds that Baker failed to preserve the issue for appeal and alternatively that the plain language of the plea agreement required him to pay "restitution as requested" by the State. Because Baker admitted participating in the drive-by shooting, the State contends the restitution was properly attributed to his crime of conviction.

To begin, Baker acknowledges he is challenging the restitution order for the first time on appeal, but he asserts several reasons why this court should consider his claim. The State urges this court not to address this issue, arguing it would be an abuse of discretion for this court to address an unpreserved issue that requires making factual findings. See *State v. Allen*, 314 Kan. 280, Syl. ¶ 5, 497 P.3d 566 (2021).

5

Contrary to the State's argument, this court can consider Baker's restitution challenge because it involves only legal questions arising on proven or admitted facts and is determinative of the case. See 314 Kan. at 283. Baker's restitution challenge requires interpreting the language of his plea agreement and the relevant statutes, which both are legal questions subject to unlimited review. *State v. Eubanks*, 316 Kan. 355, 366, 516 P.3d 116 (2022); *State v. Frazier*, 311 Kan. 378, 382, 461 P.3d 43 (2020).

In addition, Baker correctly points out we can consider his restitution challenge as an illegal sentence claim because restitution is part of a defendant's sentence. *State v. Hall*, 298 Kan. 978, 983, 319 P.3d 506 (2014); see *Eubanks*, 316 Kan. at 360 (considering illegal sentence challenge based on restitution order for first time on appeal); *State v. Johnson*, 309 Kan. 992, 995, 441 P.3d 1036 (2019); see also K.S.A. 22-3504(a) ("The court may correct an illegal sentence at any time while the defendant is serving such sentence."). Thus, Baker can challenge the legality of his restitution order for the first time on appeal.

Appellate review of an order directing a criminal defendant to pay restitution can involve three standards of review. This court reviews the "'amount of restitution and the manner in which it is made to the aggrieved party'" for an abuse of discretion. *State v. Martin*, 308 Kan. 1343, 1349, 429 P.3d 896 (2018). This court reviews the district court's factual findings supporting the causal link between the crime and the victim's loss for substantial competent evidence. 308 Kan. at 1349-50. Finally, this court exercises unlimited review of legal questions involving the interpretation of the underlying statutes. 308 Kan. at 1350.

Baker argues the district court erred in imposing restitution for the full amount of damages. He maintains the language in the plea agreement was ambiguous and should be construed against the State. See *State v. Dowdell*, No. 124,620, 2023 WL 3262432, at *12

6

(Kan. App. 2023) (unpublished opinion) (interpreting a diversion agreement). Baker acknowledges, however, that *Eubanks* is controlling.

In *Eubanks*, the defendant pleaded no contest to an attempted theft charge in exchange for the State's dismissal of charges for burglary, felony theft, and criminal damage to property. Although the written plea agreement was not made available in the record on appeal, the prosecutor recited the terms on the record as including an agreement to "'[p]ay restitution to the *victims*.'" 316 Kan. at 357. At sentencing, the district court ordered the defendant to pay restitution that included amounts owed to victims of the crimes that the State had dismissed. The Kansas Supreme Court upheld the restitution order, finding the terms of the plea agreement included an agreement to pay restitution to the victims and noting repeatedly that the defendant never objected to this understanding. 316 Kan. at 367-68.

Baker attempts to distinguish *Eubanks*, pointing out there was no written plea agreement included in the record in that case. In contrast, he asserts "this Court is presented with a written plea contract that *does not* include an explicit promise [to] pay restitution for damages caused by his dismissed charges. So, this Court shouldn't read this unstated promise into [Baker]'s contract with the government." This argument misses the mark because adopting Baker's position would also require reading language into his plea agreement, primarily that he only agreed to pay restitution for the crime to which he pled.

Here, nothing in the plain language of the plea agreement explicitly stated Baker only agreed to pay restitution associated with the charge of criminal discharge of a firearm at an occupied dwelling. The plea agreement stated Baker "agree[d] to restitution as requested" and contained Baker's acknowledgement the court could require him to "pay full restitution and reparations for all personal injury, property loss or damage." Just as in *Eubanks*, Baker never objected below when the prosecutor mentioned the total

7

amount of restitution requested, nor did he convey that he did not believe he needed to pay restitution for losses beyond the damages to the residence.

Baker also argues his restitution order is illegal because the district court ordered him to pay restitution for damages caused by dismissed charges. Even if we were to assume the plea agreement was ambiguous, Baker fails to provide a persuasive argument that the resulting damages were not caused by his crime of conviction.

Outside of a plea agreement, Kansas law only allows the district court to order restitution for "damage or loss caused by the defendant's crime." K.S.A. 21-6604(b)(1). Although Baker does not mention it, assessing causation under the restitution statute involves considering traditional elements of proximate cause, such as causation-in-fact and legal causation. See *State v. Arnett*, 307 Kan. 648, 655, 413 P.3d 787 (2018). Baker fails to engage in any meaningful discussion of this analysis. However, we easily conclude that, but for Baker's criminal conduct, the damages to the vehicles and property would not have occurred and the resulting damages were the foreseeable result of Baker's actions. He pleaded guilty to aiding and abetting in criminal discharge of a firearm at an occupied dwelling after admitting that he was the driver of the vehicle in a drive-by shooting in which multiple gunshots were fired. Put simply, there was a causal link between the resulting damages to the vehicles and Baker's crime of conviction.

II. *Did the district court err in imposing BIDS attorney fees*?

Baker next challenges the assessment of BIDS attorney fees at sentencing, arguing the district court failed to explicitly consider his financial resources and the burden such payment would impose, as required by K.S.A. 22-4513(b).

Baker acknowledges that while he asked the district court to waive attorney fees, he did not contest the imposition of BIDS attorney fees for noncompliance with K.S.A.

8

22-4513 below. Even so, that does not preclude him from raising the issue on appeal because K.S.A. 22-4513 places mandatory duties upon the district court that must be fulfilled before imposing BIDS fees on a criminal defendant. *State v. Garcia-Garcia*, 309 Kan. 801, 822-23, 441 P.3d 52 (2019) (also finding that consideration of issue is necessary to serve ends of justice); *State v. Robinson*, 281 Kan. 538, 541, 132 P.3d 934 (2006) (reviewing unpreserved BIDS fees claim as a question of law arising on proven or admitted facts and that was finally determinative of the case). Resolving this issue requires interpretation of K.S.A. 22-4513, which presents a question of law subject to unlimited review. *State v. Stoll*, 312 Kan. 726, 736, 480 P.3d 158 (2021).

K.S.A. 22-4513(b) provides, in relevant part: "In determining the amount and method of payment of such [BIDS] sum, the court shall take account of the financial resources of the defendant and the nature of the burden that payment of such sum will impose." As both parties note, the Kansas Supreme Court's decision in *Robinson* interpreting this statute controls here. In *Robinson*, our Supreme Court held under the plain language of the statute that "the sentencing court, at the time of initial assessment, must consider the financial resources of the defendant and the nature of the burden that payment will impose *explicitly*, stating on the record how those factors have been weighed in the court's decision." 281 Kan. at 546.

The State asserts the district court substantially complied with this inquiry because it reduced the BIDS fees "a little bit" after Baker agreed that he could pay $377 a month for restitution and could find employment. See *State v. Buck-Schrag*, 312 Kan. 540, 556, 477 P.3d 1013 (2020) (affirming a similar inquiry to the one taken by the district court here). In the alternative, the State asks this court for "explicit guidance" because "the fact that attorney fees issues regularly occur despite *Robinson* being decided over a decade ago suggest that more guidance would assist lower courts in properly assessing (or denying) BIDS attorney fees."

9

The district court would have had available to it the financial information on the BIDS application form Baker filled out when applying for a court-appointed attorney, detailing Baker's resources. The record reflects the court conducted an inquiry at the hearing to determine whether Baker was employed, as well as the nature and duration of his employment. The court had previously been informed by defense counsel of Baker's living arrangements. The court asked whether Baker would be able to make monthly payments of $377, and Baker said he would. At no time did Baker present additional facts to the district court to show payment of the total BIDS amount would impose a manifest hardship. In response to defense counsel's request for a waiver of all BIDS fees, the court agreed to reduce the attorney fees to $500, noting the additional $100 application fee. See K.S.A. 22-4529 (application fee of $100 is mandatory).

The statute requires the court to "take account of the financial resources of the defendant and the nature of the burden that payment of such sum will impose." K.S.A. 22-4513(b). Baker informed the court he was employed and able to make a monthly payment of $377. This shows the district court specifically considered Baker's financial resources and inquired as to whether the burden would impose manifest hardship, as required by K.S.A. 22-4513(b). After consideration of Baker's circumstances, the court waived payment for part of the BIDS fees as allowed by the statute. As a result, we find the district court substantially complied with the requirements of K.S.A. 22-4513(b). See *State v. Phillips*, 289 Kan. 28, Syl. ¶ 7, 210 P.3d 93 (2009) (holding requirement not met if BIDS fee assessed only by way of journal entry that states only the amount of fee).

III. *Does KORA violate the compelled speech doctrine under the First Amendment?*

Baker argues for the first time on appeal that the Kansas Offender Registration Act (KORA), K.S.A. 22-4901 et seq., is facially unconstitutional under the First Amendment to the United States Constitution. He contends KORA impermissibly compels speech because it requires him to provide comprehensive personal information to the

10

government and allows the government to convey a message that he is "dangerous" by making that information publicly available on the internet against his wishes. The State responds that this issue is not preserved, and, alternatively, that KORA is not unconstitutional because the offender registry website is unprotected government speech.

Generally, issues not raised before the district court cannot be raised on appeal. *State v. Green*, 315 Kan. 178, 182, 505 P.3d 377 (2022). Likewise, constitutional grounds for reversal asserted for the first time on appeal are not properly before this court for review. *State v. Pearce*, 314 Kan. 475, 484, 500 P.3d 528 (2021). Baker, however, invokes two recognized exceptions to this general rule: (1) His argument involves a question of law on proved or admitted facts and is determinative of the case; and (2) consideration of the claim is necessary to prevent the denial of a fundamental right. *Allen*, 314 Kan. at 283.

As Baker notes, even if we found these exceptions applied, the Kansas Supreme Court has said the decision to review an unpreserved claim is prudential. *State v. Jones*, 313 Kan. 917, 933, 492 P.3d 433 (2021). "Even if an exception would support a decision to review a new claim, we have no obligation to do so." *State v. Gray*, 311 Kan. 164, 170, 459 P.3d 165 (2020) (declining to apply an exception because district court analysis would have benefitted appellate review).

Multiple panels of this court have considered identical challenges to KORA, but none have agreed with Baker's position that the issue was properly before the court for appellate review. See, e.g., *State v. Spilman*, 63 Kan. App. 2d 550, 575, 534 P.3d 583 (collecting cases), *rev. denied* 317 Kan. 850 (2023); *State v. McMillin*, No. 125,589, 2023 WL 8520701, at *3 (Kan. App. 2023) (unpublished opinion), *petition for rev. filed* January 8, 2024; *State v. Harpe*, No. 124,732, 2023 WL 5992237, at *8 (Kan. App. 2023) (unpublished opinion), *rev. denied* 318 Kan. ___ (February 2, 2024); *State v. Miller*, No. 125,213, 2023 WL 5811770, at *5 (Kan. App. 2023) (unpublished opinion), *petition for*

11

*rev. filed* October 23, 2023; *State v. Parkins*, No. 125,134, 2023 WL 3667584, at *6 (Kan. App.) (unpublished opinion), *rev. denied* 317 Kan. 849 (2023); *State v. Pearson*, No. 125,033, 2023 WL 2194306, at *1-2 (Kan. App. 2023) (unpublished opinion), *rev. denied* 318 Kan. ___ (March 21, 2024).

Of these decisions, the *Pearson* panel gave a succinct explanation for declining to address a claim like Baker's for the first time on appeal:

> "Identifying the compelling governmental interests KORA is meant to protect and then determining whether it is sufficiently narrowly tailored to serve those interests involves examining a host of issues best explored first at the district court level. Analyzing the proportionality of KORA requires an in-depth balancing of its benefits and costs, along with exploring potential alternatives to achieving those benefits and the accompanying costs and anticipated effectiveness of those alternatives. It may even involve evaluating KORA's effectiveness in protecting the compelling governmental interests it is meant to serve, which could involve the presentation of evidence and fact-finding. And '[f]act-finding is simply not the role of appellate courts.' *State v. Nelson*, 291 Kan. 475, 488, 243 P.3d 343 (2010) (citing *State v. Thomas*, 288 Kan. 157, 161, 199 P.3d 1265 [2009])." *Pearson*, 2023 WL 2194306, at *1.

Moreover, as the *Spilman* panel noted, adopting the position that KORA registration constitutes compelled speech under the First Amendment leads to engaging in a "strict scrutiny" analysis that would require extensive factual development beyond the scope of the present appellate record. 63 Kan. App. 2d at 575-76. As a result, we decline to address the merits of Baker's First Amendment claim for the first time on appeal.

Baker does offer an argument that has only been addressed by one prior panel, which is based on the United States Supreme Court's decision in *303 Creative LLC v. Elenis*, 600 U.S. 570, 143 S. Ct. 2298, 216 L. Ed. 2d 1131 (2023). See *McMillin*, 2023

WL 8520701, at *3. In short, Baker contends *303 Creative* would justify reaching his unpreserved First Amendment claim for the first time on appeal because the Supreme Court in that case "found the dangers inherent in compelled speech serious enough that it reached a compelled speech challenge prospectively, e*ven before any person had been compelled to speak.*"

As the *McMillin* court noted, *303 Creative* is about whether the petitioner had standing, not whether the issue had been preserved for appeal. Moreover, the parties in *303 Creative* stipulated to several facts necessary to address the constitutional arguments presented in the case, which are simply not present here. Lastly, *303 Creative* involved compelled speech under the guise of "'excis[ing] certain ideas or viewpoints from the public dialogue,'" whereas Baker's compelled speech argument concerns information the State of Kansas "is providing . . . to protect the public from designated offenders whom the Legislature has concluded are likely to reoffend." *McMillin*, 2023 WL 8520701, at *3 (citing *303 Creative*, 600 U.S. at 588). Baker offers nothing to persuade this court to reach a different outcome.

IV. *Does KORA violate the Equal Protection Clause of the Fourteenth Amendment?*

Baker's final argument is KORA violates equal protection because it extends an exit mechanism to only some types of offenders. Baker argues that K.S.A. 22-4908(a)-(b) violates his equal protection rights because it allows "Kansas drug registrants and persons required to register in Kansas due to out-of-state convictions" to petition for removal, but that same mechanism is not made available to other types of offenders. He asserts there is no rational basis for treating these classes of offender differently and asks this court to extend KORA's "exit mechanism" to all classes of offender.

13

*Baker did not properly preserve an equal protection claim for appellate review.*

As with the previous issue, Baker admits he did not raise an equal protection argument before the district court. He again would invoke two of the recognized exceptions to argue that this court should consider this unpreserved issue. See *Allen*, 314 Kan. at 283. Still, we are under no obligation to consider the issue even if these exceptions applied. See *Jones*, 313 Kan. at 933; *Gray*, 311 Kan. at 170.

Baker first asserts that this court can consider his equal protection claim because it presents a question of law on proven or undisputed facts. In particular, he contends resolving the issue will only require examining the relevant KORA statutes to determine whether they create different, similarly situated classes of offenders. That is, answering this question would not require making any factual findings. See *State v. Dixon*, 60 Kan. App. 2d 100, 132, 492 P.3d 455 (determining whether disparate classes exist and are similarly situated only requires looking to the challenged statute and distinction advanced by defendant), *rev. denied* 314 Kan. 856 (2021); *State v. Little*, 58 Kan. App. 2d 278, 280, 469 P.3d 79 ("[T]he complaining party gets to define the groups being compared for differing treatment. *State v. Salas*, 289 Kan. 245, 249, 210 P.3d 635 [2009]."), *rev. denied* 312 Kan. 897 (2020); but see *State v. Shipley*, 62 Kan. App. 2d 272, 281-83, 510 P.3d 1194 (declining to address an as-applied equal protection challenge for first time on appeal because it would require making factual findings), *rev. denied* 316 Kan. 763 (2022). The State suggests factual differences must be considered because different classes of offender have varying registration requirements, but these are merely legal differences since this court would not need to look beyond the statutory language to identify the various registration requirements.

The panel in *Spilman* recently considered an identical equal protection challenge but declined to reach the merits because conducting the rational basis analysis required additional factual development. 63 Kan. App. 2d at 576-77; see also *State v. Huynh*, No.

14

125,419, 2024 WL 504070, at *3 (Kan. App. 2024) (unpublished opinion). Although the *Spilman* panel did not discuss any particular facts that would have benefitted its analysis, some are readily apparent.

Rational basis review is a "'very lenient standard'" but not a "'toothless'" one. *Downtown Bar & Grill, LLC v. State*, 294 Kan. 188, 194-95, 273 P.3d 709 (2012). To pass constitutional muster under rational basis review, "the proffered rational basis must both explain the distinction drawn by the statute between two classes of individuals *and* be a legitimate legislative objective." *State v. Cheeks*, 298 Kan. 1, 8, 310 P.3d 346 (2013), *overruled on other grounds by State v. LaPointe*, 309 Kan. 299, 434 P.3d 850 (2019). Baker bears the onerous burden of negating "'every conceivable [reasonable] basis which might support' the differing treatment." *Cheeks*, 298 Kan. at 8.

To be clear, the specific groups Baker is comparing are: (1) offenders who can petition for early relief from KORA registration; and (2) offenders who cannot petition for early relief from KORA registration. The applicable statute is K.S.A. 22-4908, which provides, in relevant part:

> "(a) Except as provided in subsection (b), a drug offender who is required to register under the Kansas offender registration act may file a verified petition for relief from registration requirements if the offender has registered for a period of at least five years after the date of parole, discharge or release, whichever date is most recent, or, if not confined, five years from the date of conviction or adjudication.
> "(b) An offender who is required to register pursuant to K.S.A. 22-4906(k), and amendments thereto, because of an out-of-state conviction or adjudication may not petition for relief from registration requirements in this state if the offender would be required to register under the law of the state or jurisdiction where the conviction or adjudication occurred. If the offender would no longer be required to register under the law of the state or jurisdiction where the conviction or adjudication occurred, the offender may file a verified petition pursuant to subsection (a)."

15

According to Baker, the statute creates "preferred classes of persons" in the first group because it allows Kansas and out-of-state drug registrants to petition for early removal from the registry. But contrary to Baker's position, further factual development about the differences between all types of offenders required to register under KORA would be necessary to determine whether there is a reasonable basis for different treatment, particularly because of the impact on public safety. Put simply, this court cannot properly assess for the first time on appeal whether it is rational to allow drug offenders—either those convicted in Kansas or elsewhere—to petition for removal from KORA registration requirements but prohibit that avenue for sex or violent offenders. As a result, we decline to consider Baker's equal protection challenge to KORA.

In sum, we affirm the district court's restitution order and decline to consider the merits of Baker's unpreserved constitutional challenges to his registration order.

Affirmed.