No. 120,587

IN THE COURT OF APPEALS OF THE STATE OF KANSAS

STATE OF KANSAS,
*Appellee*,

v.

DE'ANDREW V. DIXON,
*Appellant*.

SYLLABUS BY THE COURT

1.

On review of a decision to admit evidence, appellate courts consider first whether the evidence is relevant. If the court finds the evidence is relevant, the reviewing court applies the statutory rules governing the admission or exclusion of evidence.

2.

The erroneous admission of evidence is disregarded if it does not affect the substantial rights of the parties. An appellate court must determine whether there is a reasonable probability that the error will or did affect the outcome of the trial in light of the entire record. The State, as the party benefitting from the error, bears the burden of proving the error harmless.

3.

An appellate court applies a two-step analysis to claims of prosecutorial error: first determining if an error occurred and second determining the prejudice caused by the error. In determining error, the appellate court must determine whether the prosecutor's actions or statements fall outside the wide latitude afforded prosecutors to conduct the State's case and attempt to obtain a conviction in a manner that does not offend the defendant's constitutional right to a fair trial. If the appellate court finds error, then the

1

appellate court must next determine whether the error prejudiced the defendant's due process rights to a fair trial using the constitutional harmless error inquiry.

4.

The test for cumulative error is whether the totality of circumstances substantially prejudiced the defendant and denied the defendant a fair trial.

5.

Under K.S.A. 2020 Supp. 21-6819(b)(4), commonly known as the "double rule," the total prison sentence imposed in a case involving multiple convictions arising from multiple counts within an information, complaint, or indictment cannot exceed twice the base sentence.

6.

A statute's constitutionality is a question of law subject to unlimited review.

7.

The Equal Protection Clause of the Fourteenth Amendment to the United States Constitution provides that no state shall deny to any person within its jurisdiction the equal protection of the laws.

8.

The court evaluates an equal protection challenge using a three-step process. First, the court considers whether the legislation creates a classification resulting in different treatment of similarly situated individuals. Second, if the statute treats arguably indistinguishable individuals differently, then the court determines the appropriate level of scrutiny to assess the classification by examining its nature or the right at issue. Third, the court applies that level of scrutiny to the statute.

9.

Under the rational basis test, a law is constitutional, despite some unequal classification of citizens, if the classification bears some reasonable relationship to a valid legislative objective.

10.

For a statute to pass constitutional muster under the rational basis standard, it must meet a two-part test: (1) It must implicate legitimate goals, and (2) the means chosen by the Legislature must bear a rational relationship to those goals.

11.

As applied to the facts in this case, where the defendant's cases were consolidated for trial because all the charges could have been brought in one charging document, and the defendant was later convicted of multiple charges and sentenced separately in each case, the double rule found in K.S.A. 2020 Supp. 21-6819(b)(4) violates the defendant's equal protection rights under the Fourteenth Amendment.

12.

For K.S.A. 2020 Supp. 21-6819(b)(4) to comply with the Equal Protection Clause of the Fourteenth Amendment, when two or more cases are consolidated for trial because all the charges could have been brought in one charging document, and the defendant is convicted of multiple charges at trial, the defendant shall receive the benefit of the statutory double rule at sentencing regardless of whether the convictions arise from multiple counts within a single information, complaint, or indictment.

Appeal from Sedgwick District Court; BENJAMIN L. BURGESS, judge. Opinion filed May 14, 2021. Convictions affirmed, sentences vacated, and case remanded with directions.

*Reid T. Nelson* and *Debra J. Wilson*, of Capital Appeals and Conflicts Office, for appellant.

*Matt J. Maloney*, assistant district attorney, *Marc Bennett*, district attorney, and *Derek Schmidt*, attorney general, for appellee.

Before MALONE, P.J., ATCHESON, J., and BURGESS, S.J.

MALONE, J.:  A jury convicted De'Andrew V. Dixon of two counts of aggravated kidnapping, three counts of aggravated criminal sodomy, two counts of criminal possession of a weapon by a convicted felon, and one count each of rape, kidnapping, and battery after a consolidated trial of two criminal cases. The district court sentenced Dixon separately in the two cases and imposed a total controlling sentence of 2,045 months' imprisonment. Dixon appeals, arguing (1) the district court erroneously admitted evidence at trial; (2) the prosecutor committed reversible error during closing argument; (3) cumulative error denied him a fair trial; and (4) K.S.A. 2020 Supp. 21-6819(b)(4), as applied to Dixon, violated his rights under the Equal Protection Clause of the Fourteenth Amendment to the United States Constitution. We find no reversible error in Dixon's trial and affirm his convictions. But we agree with Dixon's constitutional challenge to the "double rule" found in K.S.A. 2020 Supp. 21-6819(b)(4), as applied to his cases, and we vacate his sentences and remand with directions.

FACTUAL AND PROCEDURAL BACKGROUND

Dixon's consolidated cases involve three separate sexual assaults on different women. We will set forth the facts of each assault in detail and then summarize the procedural history of Dixon's prosecution and sentencing in district court.

4

*Sexual assault on L.D.*

On October 20, 2016, around 2 a.m., L.D. left the house she shared with her boyfriend and walked to QuikTrip to buy a pack of cigarettes and use the ATM. L.D. had her purse with her that contained her Kansas ID, a social security card, and her debit card. She bought the cigarettes at Quiktrip and then started to walk home.

On her walk home, she passed Champs Bar and noticed a burgundy car driving "really slow on the side of the street," but then it parked beside the Champs' parking lot. L.D. made it home and started to put her keys in the front door when a man grabbed her from behind, put his left hand over her mouth and nose, and held a gun to her temple. The man told L.D. that he would shoot her if she did not cooperate. The man asked L.D. if she had any money and she gave him the money she had received from the ATM. He asked L.D. who else was in the home and L.D. said her boyfriend was inside, to which the man replied that her boyfriend would never let her walk alone again after tonight.

The man pulled L.D.'s hood down over her face and started walking her back to the burgundy car she noticed earlier. The man then told her to lay on her stomach in the backseat and he tied her hands behind her back. The man got into the driver's seat and drove the car somewhere. While driving, the man told L.D. that if she cooperated and did what she was told, then he would not shoot her. He told her that he had done it before, that it was easy to kill someone, but it was a lot of work to stash a body and he did not want to do all of that. The man stopped the car and asked L.D. if she knew what would happen next. When she said no, the man told her he would rape her.

The man then pulled her pants down and put his fingers in her vagina. The man opened a condom with his teeth, put it on, and penetrated L.D. with his penis. The man told her to "[s]uck his dick" but L.D. asked him not to make her do that and she lied about her stepfather making her do that. The man then gave her a choice to either "suck

his dick" or he would "come in [her] mouth." The man flipped her over, but kept her hood pulled over her face so she could not see anything, and again penetrated her vaginally and put his mouth on her nipple. He rolled her back over. He then got out of the backseat, pulled up her pants, and drove to a soda machine.

The man mentioned that he had Xanax or Lortab pills and he gave L.D. two pills. The man then dropped her off by a church and untied her hands. As L.D. got out, she noticed the condom wrapper fell out next to her foot. She did not pick it up because she was scared the man would see her, but she remembered where it was. The man told her to keep walking west and then he drove off.

L.D. walked back to her house, told her boyfriend what happened, and they called 911. She told dispatch that her assailant was black but that she did not see his face. She told the dispatcher about the condom wrapper and that the man let her out by the church. She said she did not know how old the guy was but guessed 20s and that he was 5'10". L.D. reiterated that she did not see the guy.

Wichita Police Officer Jason Harris was dispatched at 4:05 a.m. to L.D.'s address, and L.D. told Harris what happened. Harris noticed ligature marks around L.D.'s wrists. Harris asked L.D. what the man had touched, and she stated her pack of cigarettes and her cards. Harris collected L.D.'s Kansas ID, her social security card, her debit card, and the cigarettes. L.D. also told Harris about the condom wrapper. Harris took L.D. to the area where she saw the condom wrapper fall out of the car, and another officer found it. Harris then took L.D. to the hospital to complete a sexual assault exam.

Tiffany Warren, a sexual assault nurse examiner (SANE), saw L.D. at 7:20 a.m. L.D. told Warren a man penetrated her with his penis and finger. L.D. also reported that the man also had licked her breast, so Warren took a sample. L.D. reported that earlier in the morning, around 1 a.m., she had consensual oral sex with her boyfriend. L.D. told

6

Warren what happened that morning. L.D. told Warren that the man kept her purse but returned her ID, social security card, and cigarettes. Warren noted L.D. had a "parallel redness ligature pattern," about a half centimeter in width, on both of her wrists. Warren conducted a vaginal exam and found a black curly hair that Warren concluded was not L.D.'s because she was shaved. Warren collected the hair.

Wichita Police Sergeant William Stevens, a detective in the Sex Crimes Unit, was assigned to handle L.D.'s case. Stevens submitted the ID, cigarette pack, social security card, debit card, and condom wrapper for printing and DNA testing. Stevens also took swabs from L.D.'s boyfriend. Later in the investigation, Sarah Geering, a forensic scientist at the Sedgwick County Regional Forensic Science Center, submitted the DNA samples from the condom wrapper, L.D.'s ID, and her debit card to the Combined DNA Index System (CODIS). The condom wrapper and debit card came back with a "hit" to Dixon's profile in the statewide database. Geering notified Stevens of the CODIS hit, which directed him to a potential suspect, Dixon.

*Sexual assault on J.V.*

About a year after the assault on L.D., on October 11 and into the morning of October 12, 2017, another woman, J.V., was at a local bar with some friends to play the open mic night. J.V. had a purse with her and a gym bag full of stuff, including a phone and a laptop. She wore a black Wichita State hat, a summer top, a skirt, Ed Hardy converse shoes, a Mother Teresa necklace, earrings that she made, and underwear and a bra. J.V. also had purplish hair at the time.

After some time at the bar, J.V. and her friends planned to go to an apartment down the street. J.V. ended up walking alone because her friends were on motorcycles. While J.V. was walking, a white Dodge Charger went past her once and then came back around and approached her. J.V. thought it might have been her friend, Art, because she

7

could not see the driver and the driver said "hey, get in." J.V. got in the car but then immediately realized she did not know the person and tried to get out, but the doors were locked. The man started driving and asked J.V. where she was going, and she said just down the road to a friend's house. J.V. asked him to let her out after they had driven a few blocks, but he ignored her and kept driving.

J.V. looked around the car and saw the stereo was missing. She also saw a Wichita State parking sticker. The man drove J.V. around for a while. When they parked, the man pulled out a revolver with a brown wooden handle. He came around and opened J.V.'s door and told her they were going to his apartment to smoke and he put the gun to her back. They began walking but the man took her past the apartments, across the street, and past some spectator stands. He gave J.V. something to smoke that she likened to marijuana mixed with formaldehyde. J.V. said the last thing she remembered before blacking out was stepping onto Ohio Street and the man putting his arm around her neck.

J.V. then woke up in a field naked and beat up. J.V. had scrapes on her heels and knees and her mouth was bleeding. J.V. saw the man in front of her and noticed he was wearing "soldier boots" like a police officer. J.V. told him that she might have AIDS or an STD. At one point he went behind her and tried to have anal sex with her. The man penetrated J.V.'s anus with his penis. He then put his penis in her mouth. J.V. stated the man punched her when she said something that "must have . . . pissed him off."

J.V. said a car drove by and that scared the man. They started to walk somewhere but she said she was not going anywhere naked and he handed her yoga pants from her gym bag and boots. They walked to an area under a bridge and she noticed the man had the gun in his back pocket. J.V. grabbed the gun and threw it in a ditch next to where they were walking. The man then turned around and ran. J.V. then ran the other way. J.V. had her purse with her but she never saw her gym bag, with her phone and laptop, again.

8

J.V. eventually made it to a friend's house and fell asleep. When she woke up, she tried finding a number for the sexual assault center but could not find it in the phonebook, so she and her friend walked to Interfaith Ministries and called 911 at 5:29 p.m. J.V. reported that she was "snatched" and then woke up naked in a park and that she was beaten, and she was not sure if she had been raped. J.V. described the white Charger as having a Wichita State parking sticker in the lower left corner and that the radio was ripped out. She also said there was a Chiefs lighter and a taser in the car.

Wichita Police Officer Kasey Weidner was dispatched to Interfaith Ministries. Weidner met with J.V. and interviewed her. J.V. told Weidner that she was unconscious for an unknown amount of time but when she woke up, she was naked face down in a pool of blood. J.V. said that she would come to for short periods of time and see a man but then she would black out again. J.V. said the last time she came to, the man was behind her as if he were going to penetrate her anally. J.V. said she told him he should not do that because he did not know what kind of STDs she had, and he then walked in front of her and told her "to suck his dick." J.V. reported that the man then put his penis in her mouth. J.V. got his penis out of her mouth and told him that she was not going to do that either because of the blood on her face. J.V. said the man then wiped off the blood on her mouth. J.V. told Weidner that the next time she saw a clock was around 5 a.m.

J.V. told Weidner the route and locations she and the man covered. Weidner called Wichita Police Officer Juston Bradley and asked him to go to the location J.V. reported and search the canal to the south of the bridge for a revolver. Bradley searched for the revolver but could not find anything, so Weidner drove J.V. to the scene. While walking the area, they found some of her clothes and an earring. Crime Scene Investigator Cassidy Coberly photographed the items found by Weidner. Coberly also found her hat, then shoes, her black top, then the bra while walking along the fence line toward the canal. Coberly noticed that the straps on J.V.'s tank top were torn, and it had dirt in a

9

linear pattern on the back. Coberly also photographed disturbed dirt in a straight line just west of J.V.'s shoes. Coberly also found J.V.'s underwear.

J.V. went for a sexual assault exam. Shayla McDonald, a SANE nurse, treated J.V. at 12:43 a.m. on October 13, 2017. When asked whether she was penetrated vaginally, anally, or orally, J.V. told McDonald that she did not know. McDonald noticed J.V. had a bruise on the left side of her eye, a bruise by her left ear, a bruise on her chin/neck area, bruising on top of her lip and her nose, an abrasion under her lip, and bruising on both her top and bottom lips. J.V. also had a bruise on the top of her thigh, a scrape on her ankle, a bruise on her calf, and an abrasion close to her foot. She had an abrasion on her back, red areas on her buttocks, and bruises on the back side of her leg. J.V.'s neck had multiple bruises and abrasions and she had "scattered red and raised skin" under her right breast. She also had multiple bruises and petechiae on her arms. J.V. had an abrasion to the top lip and bottom lip and petechiae on the roof of her mouth. McDonald said the petechiae was consistent with strangulation and with an object being forced in her mouth.

*Dixon's arrest*

Wichita Police Detective Patricia Brock was assigned J.V.'s case on October 13, 2017. Early the next day, J.V. was looking at her Google timeline, which allows a user to track where their devices are located, and she noticed the dot was moving on the tracker. J.V., who was riding in a friend's car, decided to follow the dot. She eventually saw a white Charger and recognized it as the car driven by her attacker. Wichita Police Officer Derek Ervin and his partner Officer Samuel Dugo were dispatched to a call from J.V., who reported she had located and was following the suspect car from her rape. J.V. stayed on the phone with dispatch giving updated information as she followed the car.

Ervin eventually caught up with the car and stopped it. He identified Dixon as the driver and sole occupant of the Charger. Ervin asked Dixon if there were any weapons in

10

the car and Dixon responded "no" but looked toward the center of the passenger side and then behind him. Ervin had Dixon go with Dugo to his patrol car. While Dixon was with Dugo, he stated that the Charger was his girlfriend's and that there may be a taser, pepper spray, or a gun in the car, all of which he claimed belonged to her. Ervin noticed that the car's windshield had a yellow sticker with a black "W" on it. The sticker was for the Winfield Music Festival and had a parking number and a little character next to it. Ervin also noted that the radio was missing, and he saw a Chiefs lighter.

Ervin went to the truck J.V. was riding in and spoke with her. J.V. was distraught and emotional when she told Ervin that the car was the one involved in her sexual assault. J.V. could see the driver and confirmed he was the man who assaulted her. Ervin and his sergeant then pulled up J.V.'s 911 call and determined there were noticeable similarities between her description of the car in the 911 call and Dixon's car, including that the stereo was missing and the sticker on the front. Based on these similarities, officers took Dixon and J.V. to be interviewed. The car was towed for processing.

Brock was called in to interview J.V. and Dixon after the car stop. J.V. told Brock about the assault. During the interview, J.V. stated she was apprehensive about reporting the assault because the man wore tactical boots and she was not sure if he was a "dirty cop." During her interview, J.V. asked if she could look at the man again, so Ervin took her into a video monitoring room where she could see Dixon on screen. J.V. stated, "[O]h my God, yes, that's him."

Brock then interviewed Dixon. Dixon told Brock he had a girlfriend, Kelli Sharp, and that he was on the phone with her during the stop. Dixon claimed that he could not have picked up anybody off the street on October 11 or 12 because he was in Augusta with Sharp and his baby packing for an upcoming move. Dixon also claimed the car was in his driveway the whole night. Dixon said the only time he came to Wichita was on October 13. Dixon agreed to give Brock a DNA sample.

11

*Further police investigation and charges*

Stevens, the detective from L.D.'s case, was informed that Dixon was arrested. Stevens came to talk to Dixon, and he showed Dixon L.D.'s picture and asked if he recognized her. Dixon originally said he did not know her, then decided he could not definitively say if he knew her or not. Stevens asked Dixon if there was any reason why his DNA would be on the "scene" from L.D.'s crimes, to which Dixon stated maybe he threw out a cigarette butt.

Meanwhile, Brock obtained a search warrant for the Charger and Crime Scene Investigator Lindsay Weller processed the car. Weller saw the car was missing its stereo with wires sticking out and found a lighter next to the gear shift. She found "indicia" located on the front driver's door with Dixon's name on it. In the center console, Weller found a "Security Enforcement Officer" badge attached to a leather holder, a watch, notebook, and zip ties. She found a "pinkish/purplish" hair on the floorboard and another one on the buckle latch. Weller found a cell phone, a VISA card, and an iPhone power-pack above the gear shift. Weller found a stun gun in the door panel pocket of the passenger door. She also found a revolver in the glovebox. Weller took swabs from the front passenger door and seatbelt to try to get DNA. She also collected a silver-crossed pendant, a silver chain with a heart pendant, and a rose-colored watch with white stones. Weller collected one print from the gun and took swabs for possible DNA.

While Dixon was in jail, he made several recorded phone calls to Sharp. Highly summarized, Dixon told Sharp that he would need her to do "a lot of shit" for him. In one phone call, Dixon told Sharp to try to get his stuff from the car and throw away his phone. In another call, Dixon admitted that he had cheated on Sharp by having his dick sucked but he never "busted a nut." Sharp told Dixon that she knew he picked up strangers. Dixon reiterated that he did have his dick sucked a couple of times before

12

Sharp and Dixon's son was born. Dixon asked Sharp if she was going to stand with him or against him and stated that he needed her on his team.

On October 19, 2017, the State charged Dixon in a four-count complaint with aggravated criminal sodomy, aggravated kidnapping, aggravated battery, and criminal possession of a weapon in 17CR3099 for the crimes against J.V. On November 22, 2017, the court held a preliminary hearing and bound Dixon over for trial on those charges. On February 1, 2018, the State amended the complaint in 17CR3099 and added two counts for the crimes against L.D., count 5 for aggravated kidnapping and count 6 for rape.

*Investigation of crimes involving K.D.*

On April 7, 2018, Wichita Police Officer Erik Landon was dispatched to Sedgwick County Jail to speak with K.D., who was in jail, about a sexual assault. K.D. stated that the assault occurred sometime in September or October 2017. K.D. explained that she did not report the incident at first because the man referred to himself as a dirty police officer and she was afraid he would retaliate, but K.D. felt safe now that she was in jail.

K.D. told Landon that she left her home around 10 p.m. to take a walk. As she was coming back, a man approached her on foot. The man talked with her and walked next to her and they ended up at his car, a white Dodge. The man got a call to pick up a friend and he asked if she wanted a ride. K.D. said she felt okay at that moment, so she accepted his offer. The man drove and picked up his friend and dropped him off, then drove K.D. to a smoke shop. K.D. stayed in the car while the man went inside.

While she was alone in the car, K.D. looked in the center console and saw a badge that looked like a Wichita police badge. The man got back in the car and K.D. asked him if he had been in law enforcement. The man's attitude began to change, and he asked why K.D. wanted to know. At that point, they pulled up to where K.D. lived and she started to

13

get out. The man then grabbed her around the throat with one arm and pulled her back with a gun to her head and stated, "[Y]eah, and I'm a dirty one." K.D. described the gun as an old revolver with a wooden handle.

The man then drove to an alley with the gun still on her and asked her why she was trying to fight him. He told K.D. that if she did what he said, then he would not hurt her; but if she refused to do what he said, then he would plant drugs on her and take her to jail. When they got to the alley, the man forced her head down to his lap where his pants were opened, and he forced his penis into her mouth. The man had a condom on. The man said he thought someone was watching them, so he drove the car to another alley. He again forced his penis into K.D.'s mouth. During this incident, K.D.'s purse got overturned and the contents spilled on the passenger side floorboard.

After the assault, the man handed K.D. a soda and had her drink it and pour it on her hands. He then let her out of the car and told her to take the battery out of her phone. As she got out of the car, she scooped everything up off the floor and dumped it into her purse. The man drove off and K.D. called a friend to come walk her home. Later that evening, she went through her purse and found a Seven Clans Casino Players Club card in her purse that had Dixon's name on it. K.D. had never seen that card or heard of the name before. K.D. placed her clothes and the card in a bag she put in her car, but she lived in different places and eventually the stuff was stolen out of her car.

Landon called Wichita Police Sergeant Vanessa Rusco per department policy because K.D. reported that the man was a police officer. Rusco investigated employee records and found no officer with the name Dixon or Dickson. Rusco then relayed the call and information to Stevens in the Sex Crimes Unit. Stevens then referred Landon to Brock because she was working a case involving Dixon.

14

Brock went to talk with K.D. and she told Brock she thought the man planned the assault because he had a condom on the whole time, and he had the unopened bottle of soda and a towel. K.D. told Brock about the Seven Clans casino card and remembered the name but said she could not remember how to spell Dixon. Brock called the casino and discovered that Dixon did have a player's card and it was last used on October 3, 2017. Brock also went back and looked at the pictures from the car search and found the badge which was in the center console as K.D. said. Brock showed K.D. a photo array and K.D. identified photo four as the person who assaulted her. Photo four was Dixon.

On April 10, 2018, the State filed a four-count complaint in case 18CR895 for the crimes against K.D., charging Dixon with kidnapping, two counts of aggravated criminal sodomy, and criminal possession of a weapon. On April 24, 2018, the district court held a joint preliminary hearing and bound Dixon over for trial not only for the charges in 18CR895 but also for the two amended counts in 17CR3099 for the crimes against L.D.

*Consolidation of cases and trial*

On August 3, 2018, the State moved to consolidate 17CR3099 and 18CR895 for trial. The same day, Dixon moved to sever counts 5 and 6 from 17CR3099, related to L.D., from counts 1 through 4, related to J.V. The district court held a hearing on the motions and took the matter under advisement. At a hearing on the morning of the first day of trial, the district court denied Dixon's motion to sever the charges and granted the State's motion to consolidate, finding the charges could have been brought in a single charging document. There was some discussion on whether the consolidation applied to sentencing, and the prosecutor asserted Dixon would be sentenced under separate case numbers assuming he was convicted. The district court agreed with the prosecutor.

The district court held an eight-day jury trial starting on August 13, 2018. The State called 35 witnesses, many of whom were law enforcement officers who testified to

15

responding to the above events, collecting evidence, and establishing a chain of custody. L.D., J.V., and K.D. all testified at the trial, and J.V. and K.D. identified Dixon as the man who attacked and sexually assaulted them.

Stephanie Cline, a forensic scientist in the biology section at Sedgwick County Regional Forensic Science Center, examined the grip of the gun and found a mixture of at least three individuals with one being male based on the chromosomes. The major profile on the grip was consistent with J.V.'s profile and the probability that someone other than J.V. contributed the DNA was 1 in 241 octillion. Dixon's was excluded from the major profile, but the minor profiles were of no comparative value.

Geering testified to submitting profiles from the condom wrapper, the ID, and the debit card to the CODIS database. She explained that the Kansas database contained 198,000 profiles and the national database contained 17.33 million profiles and that she received a CODIS hit on Dixon from the state database. Geering then explained that procedurally, after they get a CODIS hit, they are required to go in and run the known standard and do analysis based on data from outside the CODIS database. CODIS is merely an investigative lead.

Geering took the known samples from L.D., L.D.'s boyfriend, and Dixon and compared them to the sample from the condom wrapper. Of the three profiles on the edge of the wrapper, only two profiles were at the necessary threshold to do statistical analysis. She then compared Dixon's known profile to the profile in the mixture and determined that it was consistent, and he could not be excluded. Geering said the statistical probability of selecting someone at random who would not be able to be excluded from the edge of the condom wrapper would be 1 in 8. Geering said the same thing happened with the debit card. The probability of selecting an unrelated person at random who would exhibit a profile consistent with a contributor on the debit card is 1 in 46. Dixon was excluded from the condom wrapper.

16

Lisa Burdett, a forensic scientist from the Kansas Bureau of Investigation (KBI), analyzed the hair from L.D.'s vagina and the debit card and a known sample. She did "Y DNA testing," the test only of the male chromosome. Burdett explained that in samples where there is a lot of other female DNA present, they use this test to target the male profile. Burdett did not find male DNA on the hair, but she stated that could be because hairs that do not have the root material, i.e., those that fall out, have very little DNA material on it. On the debit card, Burdett found male DNA and determined that profile was consistent with Dixon's profile. Burdett said statistically, the probability of selecting an unrelated male at random from the general population with the male DNA obtained from the card would be 1 in 699.

After the State rested, Dixon called Sharp as a witness. Sharp said Dixon lived with her in October 2016 until his probation was transferred to Oklahoma. Sharp claimed Dixon was to report to his probation officer on October 20, 2016. Sharp said she drove Dixon since he did not have his own car and she would drive down the day before the reporting date. Sharp also testified that on October 11, 2017, at 5:14 p.m., she, Dixon, and their son were at the parking lot in front of the Kansas Star Casino and she had pictures on her phone to prove it. But Sharp said they did not go into the casino they just sat in the lot. Sharp also said she had a transaction on her card at 1:55 a.m. on October 12, 2017, from a QuikTrip on the way into Augusta and that Dixon was with her at that time. Sharp affirmed that Dixon was with her from 5:15 p.m. through 1:55 a.m.

Sharp also testified that she knew J.V. and that she had come to their house in 2017 to purchase the gun. Sharp said J.V. handled the gun but Sharp decided not to sell it to her. On cross-examination, Sharp conceded that when she got the car back with a copy of the search warrant she called Dixon and stated the search warrant said they took a debit card with J.V.'s name on it, and Sharp did not talk about knowing J.V. on that call.

17

Dixon testified that in October 2016 he was moving from Augusta, Kansas, to Tulsa, Oklahoma. Dixon testified that on October 12 his probation officer in Kansas gave him permission to move to Oklahoma and he moved down there the next day. Dixon said he did not remember going to the appointment on October 20, 2016, but stated he knew he never missed an appointment. Dixon testified that on October 19 and 20, 2016, he lived in Tulsa, Oklahoma, with his grandmother and had no contact with L.D.

Dixon said in September and October 2017 he had just moved back to Kansas and he did not have contact with K.D. He also testified that he did not have contact with J.V. on October 11 or 12, 2017. Dixon said he did know J.V. but knew her as "Lady J" and she came over to his house in June 2017 to purchase the gun Dixon was selling behind Sharp's back. Dixon said J.V. handled the gun but the transaction did not go through because Sharp did not want to sell it. Dixon admitted to handling the gun even though he knew he was not supposed to. Dixon admitted he told Brock he was at home on October 11 and 12 and did not mention the casino or the drive back to Augusta.

On rebuttal, the State called Ryan King, Dixon's Oklahoma parole officer, who testified that Dixon reported on October 13, 2016, and then next reported on October 28, 2016. King testified that he did not see Dixon on October 20, 2016. King also testified that his notes did not reflect that Dixon ever said he had trouble finding a ride or that his girlfriend had to drive down from Kansas to take him.

On August 22, 2018, the jury found Dixon guilty of all counts as charged except the jury found Dixon guilty of the lesser offense of battery against J.V. instead of aggravated battery. The district court ordered a presentence investigation in each of Dixon's cases and scheduled the cases for a joint sentencing hearing.

18

*Sentencing hearing*

On October 1, 2018, the district court sentenced Dixon. The district court reiterated that although the cases were tried together, they remained separate cases for sentencing purposes. In 17CR3099, Dixon's base sentence for his primary crime of conviction was 653 months' imprisonment. The district court imposed consecutive sentences on the remaining counts in that case for a controlling felony sentence of 1,157 months' imprisonment with lifetime postrelease supervision. In 18CR895, Dixon's base sentence for his primary crime of conviction was again 653 months' imprisonment. The district court imposed consecutive sentences on the remaining counts in that case for a controlling sentence of 888 months' imprisonment with lifetime postrelease supervision. The district court ordered the sentences in the two cases to run consecutive. Dixon timely appealed the district court's judgment.

CHALLENGES TO THE ADMISSION OF EVIDENCE

Dixon's brief contains multiple evidentiary challenges to two distinct pieces of evidence: (1) women's jewelry and (2) the CODIS hit. Under Issue I in his brief, he challenges the relevance of the women's jewelry, and he argues that the CODIS hit was more prejudicial than probative. He then briefs one harmless error analysis for both pieces of evidence. In his Issue II he challenges the CODIS hit on hearsay, foundation, and Confrontation Clause grounds and references his harmless error argument from Issue I. For ease of analysis, this opinion will address all the CODIS hit evidentiary challenges in one section and the challenge to the women's jewelry in a separate section.

*Did the district court commit reversible error in admitting evidence of the CODIS hit?*

Dixon argues the district court erred in admitting the evidence of the CODIS hit through testimony from Stevens and Geering because evidence of the hit was more prejudicial then probative. The State asserts that Dixon's challenge to at least some of the

19

testimony about the CODIS hit was not preserved with a contemporaneous objection at trial. A verdict will not be set aside based on the erroneous admission of evidence unless a party lodges a specific and timely objection. K.S.A. 60-404.

During Stevens' testimony, the prosecutor asked if he received any indication of a known suspect after he sent samples to the forensic center. Dixon objected, claiming, among other things, that the testimony would be "getting into a lot of science and prejudicial potentially misleading information by having the sergeant testify about the science." The district court overruled his objection, stating the State was essentially offering Stevens' testimony to prove why he took the next steps in his investigation. Stevens answered the State's question, stating he received a notification from the forensic center that a CODIS hit produced Dixon as a potential suspect. Stevens then contacted L.D. to do a photo lineup. Thus, Dixon has preserved his argument related to Stevens' testimony that he received a CODIS hit because it was too prejudicial.

Similarly, when Geering began her testimony, Dixon objected because the CODIS testimony was too prejudicial to be probative because it did not carry any statistical feature. The district court overruled the objection stating that the CODIS database simply contained profiles that either matched or did not match and that further testing was then required, at which point the statistical analysis is conducted with a known sample. Thus, Dixon has preserved his argument that the district court should have excluded Geering's initial testimony about the CODIS hit because it was too prejudicial. But to the extent that Dixon is challenging Geering's later specific testimony that the state database contained 198,000 profiles and the national database contained 17.33 million profiles, Dixon did not object to this testimony when it was elicited through questioning. Thus, Dixon has not preserved any claim on appeal about the erroneous admission of this testimony.

Turning to the merits of the issue, Dixon concedes that there "was some limited relevance to the CODIS hit, in that it was relevant to show why the police focused their

20

investigation on Mr. Dixon." But Dixon asserts that allowing the CODIS hit into evidence had the possibility of misleading the jury because the jury could assume it was substantive evidence of Dixon's presence at L.D.'s crime scene. Dixon then cites various out-of-state cases for the proposition that DNA evidence is prejudicial and misleading if it does not come with statistical analysis.

The State argues that the CODIS hit evidence was presented in a manner authorized under Kansas caselaw and that Geering testified to having to conduct follow up testing. The State also points out that Geering testified to the statistical evidence based on her follow up testing and, thus, the cases Dixon cites do not advance his argument.

"On review of a decision to admit evidence, appellate courts consider first whether the evidence is relevant. If the court finds the evidence is relevant, the reviewing court applies the statutory rules governing the admission or exclusion of evidence. [Citation omitted.]" *State v. Davis*, 312 Kan. 259, 276, 474 P.3d 722 (2020). "Evidence is relevant if it has any tendency in reason to prove any material fact." 312 Kan. at 276 (citing K.S.A. 60-401[b]).

Dixon concedes that the CODIS hit was relevant to establish why Stevens focused on Dixon and showed L.D. a photo array containing Dixon's picture. The CODIS hit was also relevant to establish why Geering requested a known sample from Dixon and conducted further analysis. Thus, the CODIS hit was relevant in establishing why further investigation into Dixon and additional DNA testing was warranted. We observe that although the district court allowed the testimony about the CODIS hit for a limited purpose, neither party asked the court to give a limiting instruction to the jury on how to evaluate the evidence, nor did the court sua sponte give a limiting instruction.

Under K.S.A. 60-445, "the judge may in his or her discretion exclude evidence if he or she finds that its probative value is substantially outweighed by the risk that its

admission will unfairly and harmfully surprise a party who has not had reasonable opportunity to anticipate that such evidence would be offered." Our Supreme Court has interpreted this statute to allow excluding evidence if the district court determines that the evidence's probative value is "'substantially outweighed'" by its prejudicial effect. 312 Kan. at 276. This court applies an abuse of discretion standard to the district court's ruling. A judicial action constitutes an abuse of discretion if (1) it is arbitrary, fanciful, or unreasonable; (2) it is based on an error of law; or (3) it is based on an error of fact. 312 Kan. at 276. Dixon bears the burden of showing that the district court abused its discretion. *State v. Thomas*, 307 Kan. 733, 739, 415 P.3d 430 (2018).

Because the evidence is relevant, Dixon must show the district court abused its discretion by allowing the evidence despite the risk of undue prejudice. He fails to carry his burden on this issue. Dixon's entire argument on this point is that evidence of the CODIS hit was prejudicial because it did not come with statistical analysis "to guide jurors in their assessment of the probative value." But Dixon's argument ignores the fact that the CODIS hit evidence was followed by substantial testimony from Geering about further DNA testing and her statistical analysis of that testing.

Geering explicitly stated that a CODIS hit is merely an investigative lead. She then stated that after she gets a CODIS hit, she must obtain and run a known standard from outside the CODIS database to do further testing. She requested a known sample from Dixon so she could engage in that analysis. She then extensively testified about the results of her statistical analysis of the known sample from Dixon and the various samples from the scene. Thus, Dixon's argument that evidence of the CODIS hit was prejudicial because it did not come with statistical analysis is unsupported by the record.

Dixon next challenges Geering's CODIS hit testimony, for the first time on appeal, as violating the Confrontation Clause of the Sixth Amendment to the United States Constitution. But this argument is easily disposed of as it is unpreserved.

22

Dixon concedes he did not object to this testimony on Sixth Amendment grounds. The State argues that Dixon is precluded from raising this Sixth Amendment issue because he did not make a specific objection on that ground before the trial court. Dixon counters that this court can hear his argument for the first time on appeal because it is necessary to prevent the denial of a fundamental right.

A verdict will not be set aside based on the erroneous admission of evidence unless a party lodges a specific and timely objection. K.S.A. 60-404. The Kansas Supreme Court has made clear that appellate courts will not review an evidentiary issue without a timely and specific objection even if the issue involves a fundamental right. *State v. Logsdon*, 304 Kan. 3, 28, 371 P.3d 836 (2016). Because Dixon concedes that he did not object below on Confrontation Clause grounds before the trial court, he did not preserve his Confrontation Clause challenge for this court's review.

Dixon also argues that Geering's testimony about the CODIS hit was admitted without a proper foundation. A challenge to the district court's admission of evidence over a foundation objection is reviewed for an abuse of discretion. This court will not disturb a district court's ruling unless no reasonable person would have taken the view adopted by the district court. *State v. Jenkins*, 311 Kan. 39, 44-45, 455 P.3d 779 (2020). A witness must have personal knowledge of the matter about which he or she is testifying. *State v. Olsman*, 58 Kan. App. 2d 638, 653, 473 P.3d 937 (2020), *rev. denied* February 2, 2021; see K.S.A. 60-419 ("As a prerequisite for the testimony of a witness on a relevant or material matter, there must be evidence that he or she has personal knowledge thereof, or experience, training or education if such be required. Such evidence may be by the testimony of the witness himself or herself.").

Geering testified to how CODIS works, how and why known profiles are entered into the database, and how the database consists of three tiers: a local database, a state database, and a national database. She then affirmed that she submitted the sample from

the edge of the condom wrapper and the debit card into the database. Geering testified that "the way the database works" is it gives her the person's DNA profile numbers and then she determines whether it matches the sample submitted. Contrary to Dixon's assertion, no other witness needed to testify how the national database works as Geering herself knew about the workings of the national database and testified to such. Geering stated she worked with the DNA unit for 16 years. Thus, Geering testified that she had personal knowledge and training regarding CODIS. Dixon's foundation challenge fails.

Dixon's final challenge to Geering's CODIS testimony is that the testimony should have been excluded as inadmissible hearsay evidence. He claims that because Geering received a report of the CODIS hit prepared by Holly Evans at KBI and Geering did not receive the CODIS hit notification directly from the CODIS database, Geering's testimony that there was a CODIS hit constituted hearsay. Dixon did not object at trial and does not argue on appeal that the DNA evidence itself was hearsay.

This court reviews a trial court's admission of hearsay statements for an abuse of discretion. *State v. Randle*, 311 Kan. 468, 476, 462 P.3d 624 (2020). But an error of law or fact is an abuse of discretion. *Davis*, 312 Kan. at 276. Hearsay evidence is "a statement which is made other than by a witness while testifying at the hearing, offered to prove the truth of the matter stated." K.S.A. 2020 Supp. 60-460. A "[s]tatement" is defined as "not only an oral or written expression but also nonverbal conduct of a person intended by him or her as a substitute for words in expressing the matter stated." K.S.A. 60-459(a).

Dixon argues that the CODIS hit testimony was used for the truth of the matter stated based on how the prosecutor argued the CODIS evidence in closing. In essence, he contends that the State's closing argument—which he summarizes as the prosecutor stating that Dixon was the only match out of 198,000—means that the district court erred by overruling his hearsay objection for the reason that the CODIS evidence was only introduced to show why the investigation began to focus on Dixon.

24

But Dixon is improperly conflating an evidentiary challenge with one based on a prosecutor's argument during closing argument. His complaint is that the evidence was originally admitted not to show the truth of the matter asserted but the prosecutor's argument during closing transformed the character of the evidence into inadmissible hearsay. The true crux of that argument is that the prosecutor made a statement during closing that did not conform to the evidence admitted at trial. That is a prosecutorial error claim that we will address later in this opinion, not an evidentiary challenge.

Thus, we find the district court did not err in admitting evidence of the CODIS hit based on the arguments presented by Dixon. But even if we assume the district court erred, any error was harmless. The erroneous admission of evidence is disregarded if it does not affect the substantial rights of the parties. K.S.A. 2020 Supp. 60-261; *State v. Lowery*, 308 Kan. 1183, 1235, 427 P.3d 865 (2018). This court must determine whether there is a "'reasonable probability that error will or did affect the outcome of the trial in light of the entire record.'" 308 Kan. at 1235. The State, as the party benefiting from the error, bears the burden of proving the error harmless. 308 Kan. at 1236.

Any error in allowing Geering to testify that there was a CODIS hit was harmless. J.V. and K.D. positively identified Dixon as the attacker. While L.D. did not identify Dixon, the DNA evidence established that Dixon's profile could not be excluded from the edge of the condom wrapper and L.D.'s cards. Although some of the DNA evidence was not strong, the profile on the gun was consistent with J.V.'s and the probability that someone other than J.V. contributed the DNA was 1 in 241 octillion. Dixon's explanation for how J.V.'s DNA was on the gun did not hold up well on cross-examination. Dixon also made phone calls to Sharp from jail that circumstantially implied his guilt. And contrary to Dixon's assertion, his alibi defense through Sharp's testimony was less than credible and kept changing over time.

In sum, Dixon's challenges to the CODIS hit evidence as being more prejudicial than probative, as violating his Confrontation Clause rights, and as lacking foundation fail. As for his hearsay challenge, his argument does not clearly articulate a hearsay challenge or establish that the district court erred in admitting the testimony. But even assuming it did, any erroneous admission is harmless based on the entire record.

*Did the district court err in admitting the women's jewelry?*

Dixon asserts that the district court erred in admitting a silver cross pendant, a necklace with a heart pendant, and a rose-colored watch into evidence over his relevancy objection. The State introduced the jewelry through the testimony of Weller who processed the Charger under a search warrant.

The State first claims that this court should not hear Dixon's claim on this point because Dixon did not properly object to the evidence. The State points out that it admitted photos of the interior of the car and that Weller testified to what each photo showed, including that Weller saw the necklace, the cross pendant, and the watch. The State points out that the testimony and photographs were admitted before the State admitted the items. Dixon, in his reply brief, correctly asserts that the State's argument is really a prejudice argument not a preservation argument. Dixon objected to the admission of the physical pieces of jewelry. Thus, Dixon correctly asserts that this court can review his challenge to the admission of the jewelry over his relevance objection.

The State also argues that Dixon failed to designate a record showing error because he did not include the items or the photographs in the record on appeal. Dixon counters that this court can determine the relevance of the items based on the trial testimony describing the items and states that he added photos of the items to the record. Dixon correctly asserts that pictures of the jewelry were added to the record. By ensuring that the photographs are part of the appellate record, Dixon has complied with Supreme

26

Court Rule 3.07(b) (2021 Kan. S. Ct. R. 25) and has designated a sufficient record on appeal for the court to consider this issue.

Turning to the merits of the issue, Dixon claims that the jewelry was irrelevant as none of the victims identified the jewelry as belonging to them or said that Dixon took jewelry from them during the crimes. Dixon claims the evidence suggested he was keeping trophies of unreported attacks and that this evidence had the potential to inflame, divert, and confuse the jury. Dixon claims that because the jewelry had no connection to the victims or the crimes, the evidence proved no material fact and was thus erroneously admitted. The State argues the items were relevant because Dixon's car was part of the crime scene and, thus, the jury was allowed to see pictures of the car's contents even if the items captured in the photos were not directly linked to the crimes.

The threshold question of admissibility is whether the evidence is relevant. *State v. Lowrance*, 298 Kan. 274, 288, 312 P.3d 328 (2013). All relevant evidence is admissible unless it is otherwise excluded by statute. K.S.A. 60-407. In determining whether evidence is relevant, the trial court must determine whether "there is a material or logical connection between the asserted facts and the inference or result the facts are intended to establish." 298 Kan. at 288. Thus, there is a materiality element and a probative element for relevancy. 298 Kan. at 289. The evidence is material if it supports a fact or issue in dispute and evidence is probative if it has "a logical tendency to prove a material fact." 298 Kan. at 289. This court applies a de novo standard of review to determining materiality and an abuse of discretion standard to the probative element. 298 Kan. at 289.

In examining materiality, the State's argument that the jewelry was relevant is unpersuasive. First, the State claims that it was relevant because J.V. and K.D. testified about what they saw in the car. While it is true both women testified to their observations of the car, none of their testimony referenced these three pieces of jewelry. Second, the State claims that the pieces were relevant because they were found in the car which is

27

part of the crime scene. Again, while this may be true, and would explain the admission of the pictures of the car interior, it does not establish any material issue in dispute that the pieces of jewelry would support. Plenty of other items were found in the car that were not admitted at trial, even some relevant pieces like the badge. Thus, the physical pieces of jewelry were not material and thus irrelevant.

As we stated, the erroneous admission of evidence is disregarded if it does not affect the substantial rights of the parties. K.S.A. 2020 Supp. 60-261; *Lowery*, 308 Kan. at 1235. This court must determine whether there is a "'reasonable probability that error will or did affect the outcome of the trial in light of the entire record.'" 308 Kan. at 1235. The State, as the party benefiting from the error, bears the burden of proving the error harmless. 308 Kan. at 1236.

The State asserts that the admission of the jewelry was harmless because Weller testified to finding the jewelry and pictures of the jewelry were also admitted. The State correctly asserts that the jewelry was not used to argue Dixon was a serial rapist or that there were uncharged attacks. In fact, the only other place in the record that the jewelry is referenced is by Dixon himself on a jail call between him and Sharp when he states he did not know what the jewelry was that the investigators took from the car. Beyond this comment, the jewelry was not referenced again during trial.

In sum, Dixon is correct that the district court erred in admitting the jewelry over his relevance objection. But the State has adequately shown that any error was harmless as there is no reasonable probability that the admission of the evidence affected the outcome of the trial based on the entire record.

28

Dixon next argues the prosecutor committed two instances of prosecutorial error during closing argument. This court applies a two-step analysis to claims of prosecutorial error:  first determining if an error occurred and second determining the prejudice caused by the error. *State v. Patterson*, 311 Kan. 59, 70, 455 P.3d 792, *cert. denied* 141 S. Ct. 292 (2020). In determining error, the appellate court must determine whether "'the prosecutor's actions or statements "fall outside the wide latitude afforded prosecutors to conduct the State's case and attempt to obtain a conviction in a manner that does not offend the defendant's constitutional right to a fair trial."'" 311 Kan. at 70.

If the appellate court finds error, then "the appellate court must next determine whether the error prejudiced the defendant's due process rights to a fair trial" using the constitutional harmless error inquiry. *State v. Sherman*, 305 Kan. 88, 109, 378 P.3d 1060 (2016). "[P]rosecutorial error is harmless if the State can demonstrate 'beyond a reasonable doubt that the error complained of will not or did not affect the outcome of the trial in light of the entire record, i.e., where there is no reasonable possibility that the error contributed to the verdict.'" 305 Kan. at 109.

*Did the prosecutor commit error when referencing the CODIS hit evidence?*

Dixon first argues the prosecutor "erroneously argued that the CODIS 'hit' carried probative weight":

> "[PROSECUTOR]:  . . . What does [L.D.] also say? He got ahold of my stuff— driver's license, Social Security card, debit card, cigarette pack, and condoms.
> "*What do we know? This is where you decide what weight and credit to give this. CODIS hit. 198,000 people in the Kansas database. 17.33 million nationwide. The defendant was the only hit.*

"[DEFENSE COUNSEL]:  Objection, Your Honor. It assumes facts not in evidence.

"THE COURT:  Overruled.

"[PROSECUTOR]:  DeAndrew Dixon cannot be excluded from—

"THE COURT:  Ladies and gentlemen, let me just reiterate, again, statements, arguments, remarks of counsel are intended to help you understand the evidence and apply the law. They are not evidence. If any statement is made not supported by evidence, it should be disregarded.

"[PROSECUTOR]:  Thank you, Judge.

"He can't be excluded from the crimped edges of the condom wrapper. What did [L.D.] tell you? He put a condom on. He had a hand at [her] back. When she was on the stand, she motioned like grabbing it and opening it with his teeth. Consistent with where DNA was found. Crimped edges." (Emphasis added.)

Dixon asserts that the prosecutor's argument turned the CODIS hit information into an erroneous statistic:  that Dixon was the only one who could have committed the assault on L.D. by a statistical probability of 1 in 198,000 or 17.33 million. Dixon asserts the prosecutor's statement gave the CODIS hit "probative relevance" that it otherwise did not have. Dixon claims the prosecutor failed to clarify this misstatement by failing to discuss the actual probability of inclusion on the items.

The State counters that the prosecutor did not create any statistical value in her statement and instead she merely reminded the jury of the results of the CODIS testing. The State concedes that Geering did not explicitly state that Dixon was the only match, but the State argues that it is a reasonable inference because Geering's testimony never revealed that other samples matched or that there could be multiple matches to other individuals in the database.

"'Prosecutors enjoy wide latitude in crafting closing arguments . . . [, but] a prosecutor's arguments must remain consistent with the evidence.'" *Lowery*, 308 Kan. at

30

1209. In examining the prosecutor's statements, the appellate court examines the statements in context rather than in isolation. *Thomas*, 307 Kan. at 744.

At trial, Geering testified—with no contemporaneous objection by Dixon—that the CODIS database contained 198,000 profiles at the state level and 17.33 million profiles at the national level. Geering testified that the CODIS hit came from the state database and affirmed that it was the database with 198,000 profiles for comparison. She testified that the sample had had no matches to any known individuals at the national level. Dixon later objected to the introduction of the CODIS report as an exhibit, but by that time the jury had heard the database information about which Dixon complains.

Although Geering did not state that Dixon was the only match, she mentioned no other match at the state level and made clear that she had not received notification of a match from the national database. Thus, the prosecutor's statement that Dixon was the only match out of the databases reflects the evidence. Moreover, the prosecutor did not state that the likelihood of finding Dixon's DNA on L.D.'s items was a 1 in 198,000 or 1 in 17.33 million chance. Instead, the prosecutor merely summarized the contents of the CODIS database and the result of running the samples through the database.

We observe when Stevens testified earlier in the trial, the district court allowed the testimony about the CODIS hit to be admitted only to prove why he took the next steps in his investigation. Given this limited purpose for admitting the evidence, Geering's testimony about the number of profiles in the state and national databases was irrelevant and possibly misleading to the jury. But as we have noted, Geering's specific testimony about the number of profiles in each database was admitted without objection. As a result, the prosecutor could comment on the evidence during closing argument and the comments did not misstate the evidence.

31

On the other hand, the prosecutor knew about the limited purpose for admitting the evidence about the CODIS hit, and we agree with Dixon that the prosecutor's comments in closing argument tended to place a probative value on the evidence that went beyond its limited scope. To this extent, the prosecutor's comment on the database evidence may have fallen outside the wide latitude afforded prosecutors in discussing the evidence. But even if we would find that the prosecutor erred by commenting on the database evidence, our next step in the analysis would be to determine whether the error prejudiced Dixon's due process rights to a fair trial. We will engage in this prejudice analysis after we examine Dixon's second claim of prosecutorial error.

*Did the prosecutor commit error in commenting on the hair found inside L.D.?*

Dixon next argues the prosecutor committed reversible error when she opened her rebuttal closing by misstating testimony about the hair found inside L.D. and made "inflammatory statements insinuating Mr. Dixon was a serial rapist":

> "[PROSECUTOR]: A couple things I want to address. *The hair didn't have a Y chromosome. That meant it was female.* Where did that attack happen? In the backseat of the car.
> "[DEFENSE COUNSEL]: Your Honor, facts not in evidence.
> "THE COURT: Ladies and gentlemen, just remember statements, arguments, remarks of counsel are not evidence. If it is not supported, you can disregard.
> "[PROSECUTOR]: Remember the last DNA analyst that says I take the Y chromosome and I analyze it. This hair did not have a Y chromosome. Remember the other DNA analyst—
> "[DEFENSE COUNSEL]: Objection, Your Honor.
> "THE COURT: Mr. Sevart, statements and arguments of counsel are not evidence. The jury can disregard anything that is not supported by evidence. It is that simple.
> "[PROSECUTOR]: The other DNA analyst told you that men have an X and a Y. *So if there's not a Y chromosome, can you conclude from that it could be a female's*

32

*hair*[*?*] *And if it is a female's hair, how did it get inside of* [*L.D.*]*? She said fingers were being shoved in* [*her*] *in the backseat of a car where this defendant says he prefers to get his dick sucked. Could it have transferred off of him?* Off of the place that she was assaulted?" (Emphases added.)

Dixon argues the prosecutor misstated the testimony of her own expert because the expert only stated she did not *find* a Y chromosome, not that the hair did not *have* one. He argues that this misstatement was exacerbated by the State's implication that the hair must have been transferred from Dixon's backseat because he assaulted other women. The State argues that Geering testified that she found male DNA on the hair and Burdett did not. Because there were two divergent conclusions, the State asserts that the prosecutor properly offered a competing explanation for what "could" be concluded from the hair.

Geering testified that on the hair she found a mixture of at least two individuals with at least one being a male; the major profile was consistent with L.D. but the minor profiles were of no comparative value. Burdett testified that she conducted a Y DNA test to try to isolate the male chromosome. She testified that no male DNA was found on the sample from the hair. But she clarified that the result did not mean it was not a man's hair because some hair, like hair that falls out naturally, has very little DNA material in it.

As stated above, "'[p]rosecutors enjoy wide latitude in crafting closing arguments . . . [, but] a prosecutor's arguments must remain consistent with the evidence.'" *Lowery*, 308 Kan. at 1209. There was no evidence to establish that the hair was definitively female or male. The evidence only showed that there was a mix of profiles on the hair, with at least one of the profiles being male. Thus, the prosecutor's statement differed from Burdett's testimony about the inconclusive nature of the testing. As a result, the prosecutor's statement that the hair was definitively female and further inferences based on it being a female hair differed from the evidence and constitute error.

33

Thus, the prosecutor erred in commenting about the testing on the hair, and we will assume without deciding that the prosecutor erred in referencing the CODIS hit evidence. The next step is to determine whether the errors prejudiced Dixon's due process rights to a fair trial. Prosecutorial error is harmless if the State can show "'beyond a reasonable doubt that the error complained of will not or did not affect the outcome of the trial in light of the entire record.'" *Sherman*, 305 Kan. at 109.

As we have discussed, the CODIS hit was not the only evidence tying Dixon to the crimes. Likewise, the evidence about the DNA testing on the hair was only a small part of the State's case tying Dixon to the crimes against L.D. Dixon's assertion on appeal that the prosecutor's misstatement about the hair insinuated to the jury that Dixon was a "serial rapist" is a bit of a stretch, and the prosecutor's comments on the hair were limited. The district court also immediately instructed the jury that counsel's statements were not evidence and should be disregarded if they were unsupported by the evidence after Dixon's objection. We presume that jurors follow the district court's instructions. *State v. Peppers*, 294 Kan. 377, 392, 276 P.3d 148 (2012).

J.V. and K.D. positively identified Dixon as the attacker. While L.D. did not identify Dixon, the DNA evidence established that Dixon's profile could not be excluded from the edge of the condom wrapper and L.D.'s cards. And the probability that J.V.'s DNA profile was found on the gun is essentially irrefutable. Dixon also made phone calls from jail that were incriminating. Based on the entire record, we are convinced that there is no reasonable possibility that prosecutorial error contributed to the verdict. Thus, we conclude that Dixon has no right to receive a new trial based on prosecutorial error.

CUMULATIVE ERROR

Dixon argues that this court should reverse his convictions based on the aggregate effect of the trial errors. In support, Dixon asserts that the errors, taken together, led to the

34

advancement of the serial rapist narrative, which could have led the jury to convict him out of fear for the community. The State counters that the evidence against Dixon was overwhelming and thus no prejudicial error can be found.

This court's test for cumulative error is "'whether the totality of circumstances substantially prejudiced the defendant and denied the defendant a fair trial. No prejudicial error may be found upon this cumulative effect rule, however, if the evidence is overwhelming against the defendant.'" *State v. Walker*, 304 Kan. 441, 457-58, 372 P.3d 1147 (2016).

We have identified trial errors in Dixon's case, namely the erroneous admission of the jewelry and the prosecutorial error we have just discussed. But these errors were harmless individually, and we also conclude the errors did not deny Dixon a fair trial even when considered collectively. The State's cases against Dixon were very strong. A criminal defendant has a right to receive a fair trial but not a perfect one. *State v. Hayden*, 281 Kan. 112, 124, 130 P.3d 24 (2006). Dixon received a fair trial and we have no reason to overturn any of his convictions based on the arguments he makes on appeal.

DIXON'S SENTENCING CLAIM CONCERNING THE "DOUBLE RULE"

Finally, Dixon claims that K.S.A. 2020 Supp. 21-6819(b)(4), as applied to the sentencing in his cases, violated his rights under the Equal Protection Clause of the Fourteenth Amendment to the United States Constitution. More specifically, Dixon argues that K.S.A. 2020 Supp. 21-6819(b)(4), commonly known as the "double rule," violated his equal protection rights in the manner that it was applied to his sentencing following his consolidated trial of two criminal cases. He asserts the double rule treats one class of defendants—those that have multiple counts charged in one charging document—differently from another class of defendants—those that have multiple cases consolidated for trial because the charges could have been brought in one charging

document—even though the only difference between the two classes is the number of case numbers attached to the charges.

K.S.A. 2020 Supp. 21-6819(b)(4) states as follows:

> "The total prison sentence imposed in a case involving *multiple convictions arising from multiple counts within an information, complaint or indictment cannot exceed twice the base sentence*. This limit shall apply only to the total sentence, and it shall not be necessary to reduce the duration of any of the nonbase sentences imposed to be served consecutively to the base sentence. The postrelease supervision term will reflect only the longest such term assigned to any of the crimes for which consecutive sentences are imposed. Supervision periods shall not be aggregated." (Emphasis added.)

Under this statute, when a defendant is sentenced for multiple convictions, the defendant receives a base sentence for the primary offense and the total sentence cannot exceed twice the base sentence. But the provision only applies to multiple convictions arising from multiple counts within a complaint. If the State consolidates two separate cases for trial because the charges could have been brought in one charging document, and the defendant is convicted of multiple charges at trial, the district court sentences the defendant separately in each case and the double rule is applied in each case. As a result, the total sentence in the separate cases may be substantially longer than if the double rule was applied to all the counts that were consolidated for trial regardless of whether the convictions arose from multiple counts within a single information, complaint, or indictment. Dixon claims this sentencing disparity violates his equal protection rights.

A statute's constitutionality is a question of law subject to unlimited review. *State v. Gonzalez*, 307 Kan. 575, 579, 412 P.3d 968 (2018). Generally, appellate courts presume statutes are constitutional and must resolve all doubts in favor of a statute's validity. 307 Kan. at 579. Likewise, courts must interpret a statute in a way that makes it constitutional if there is any reasonable construction that would maintain the Legislature's

36

intent. 307 Kan. at 579. But when a statute implicates "'fundamental interests,'" the presumption of constitutionality does not apply. *Hilburn v. Enerpipe Ltd.*, 309 Kan. 1127, 1132, 442 P.3d 509 (2019).

Dixon concedes that he raises this issue for the first time on appeal. Generally, this court will not hear an issue raised for the first time on appeal, even a constitutional one. *State v. Phillips*, 299 Kan. 479, 493, 325 P.3d 1095 (2014). There are exceptions, including when the "theory involves only a question of law arising on proved or admitted facts and is determinative of the case" or when "consideration of the theory is necessary to serve the ends of justice or to prevent the denial of fundamental rights." 299 Kan. at 493. Dixon asserts that this court can hear this issue under these two exceptions.

The State counters that the issue is not a purely legal question because determining whether he is similarly situated to defendants who have had one trial on a multicount charging document requires this court to make a factual finding. Dixon responds that the similarly situated inquiry only involves comparing Dixon's sentencing limitations to those that would have applied if he had been charged in one charging document; it does not require comparison to other specific cases.

Dixon is correct. In resolving Dixon's claim, this court need only look at the double rule and determine whether it creates the two classes Dixon claims and if the classes are similarly situated. In doing this, this court is limited to examining the distinction advanced by Dixon. See *State v. Cheeks*, 298 Kan. 1, 5, 310 P.3d 346 (2013), *overruled on other ground by State v. LaPointe*, 309 Kan. 299, 434 P.3d 850 (2019). Thus, our analysis does not require this court to make factual findings. See *State v. Denney*, 278 Kan. 643, 650-51, 101 P.3d 1257 (2004) (addressing whether the classes presented by the appellant were indistinguishable even though the issue was raised for the first time on appeal, finding it presented a question of law on proven or admitted facts).

While the State is correct that determining whether consolidation of charges for trial is warranted is a factual inquiry, that question is not the issue here. Thus, this court can hear Dixon's issue under his first claimed exception. We also agree with Dixon that consideration of the issue is necessary to serve the ends of justice or to prevent the denial of fundamental rights.

Before proceeding with further analysis, we observe that the Kansas Supreme Court has held that under the language of the statute, the double rule does not apply to separate cases that are consolidated for trial under K.S.A. 22-3203. *State v. McCurry*, 279 Kan. 118, 127, 105 P.3d 1247 (2005). But the holding in *McCurry* is based strictly on statutory construction and the constitutionality of the statute was not challenged in that case. Thus, we can address Dixon's constitutional challenge to the statute, and we are not duty bound to follow our Supreme Court's holding in *McCurry*. See *State v. Rodriguez*, 305 Kan. 1139, 1144, 390 P.3d 903 (2017) (holding that Kansas Court of Appeals is duty bound to follow Kansas Supreme Court precedent unless there is some indication the Supreme Court is departing from its previous position).

As a final preliminary matter, we observe that for a party to have standing to make a legal claim, the party must show that he or she has suffered a cognizable injury and that there is a causal connection between the injury and the challenged conduct. *Gannon v. State*, 298 Kan. 1107, 1123, 319 P.3d 1196 (2014). In other words, Dixon must have suffered a cognizable constitutional injury to bring his equal protection claim. The district court sentenced Dixon to 2,045 months, or about 170 years, in prison in his two cases. As we will explain below, if Dixon prevails on his constitutional claim, his sentence will be limited to 1,306 months, or about 109 years, in prison. Either way, Dixon, who was born in 1984, will serve the rest of his life in prison. Still, we discern that a difference in sentence of about 61 years amounts to a cognizable injury giving Dixon standing to bring his claim, even though the result of this appeal may have little practical effect for him.

38

Turning to our analysis of Dixon's claim, the Equal Protection Clause of the Fourteenth Amendment provides that "[n]o State shall . . . deny to any person within its jurisdiction the equal protection of the laws." U.S. Const. amend. XIV, § 1. Under the Equal Protection Clause "similarly situated individuals should be treated alike." *State v. Gaudina*, 284 Kan. 354, 372, 160 P.3d 854 (2007). The Constitution "does not require that all persons receive identical treatment, but only that persons similarly situated with respect to the legitimate purpose of the law receive like treatment." 284 Kan. at 372.

This court engages in a three-step process in reviewing an equal protection claim:

"First, it considers whether the legislation creates a classification resulting in different treatment of similarly situated individuals. If the statute treats "'arguably indistinguishable'" individuals differently, the court determines next the appropriate level of scrutiny to assess the classification by examining its nature or the right at issue. Then, the court applies that level of scrutiny to the statute. [Citations omitted.]" *State v. LaPointe*, 309 Kan. 299, 316, 434 P.3d 850 (2019).

*Does the double rule treat arguably indistinguishable individuals differently?*

Dixon argues that the double rule distinguishes between two similarly situated defendants: (1) defendants who had one trial on multiple counts charged in one charging document and (2) defendants who had one trial on multiple counts charged in separate charging documents consolidated for trial based on a finding that the charges *could have* been brought in one charging document. Dixon argues that the only distinction between these two classes of defendants is that the latter class has multiple case numbers attached to the charges. The State does not present an argument on whether the two classes are arguably indistinguishable. Instead, the State asserts that Dixon's challenge is essentially a challenge to prosecutorial charging discretion.

39

Dixon bears the burden of establishing that he is similarly situated to members of a class receiving different treatment. *Cheeks*, 298 Kan. at 5. In conducting review, this court is "limited 'by the distinctions argued by the complaining party.'" 298 Kan. at 5. Our Supreme Court has recognized that "[d]etermining whether individuals are similarly situated is 'not always susceptible to ease of application.'" 298 Kan. at 5.

The district court consolidated Dixon's cases for trial under K.S.A. 22-3203, which states: "The court may order two or more complaints, informations or indictments against a single defendant to be tried together if the crimes could have been joined in a single complaint, information or indictment." Crimes can be charged in the same charging document "if the crimes charged . . . are of the same or similar character or are based on the same act or transaction or on two or more acts or transactions connected together or constituting parts of a common scheme or plan." K.S.A. 22-3202(1).

Dixon's argument that the double rule distinguishes between "arguably indistinguishable" classes has merit. Essentially, both classes of defendants Dixon identifies proceed to one trial on multiple charges that "are of the same or similar character or are based on the same act or transaction or on two or more acts or transactions connected together or constituting parts of a common scheme or plan." But only defendants who have all the crimes brought in one charging document can benefit from applying the double rule to all the convictions together. Defendants who have crimes filed in separate charging documents consolidated for trial cannot benefit from applying the double rule to all the convictions together. The only difference between these two classes of defendants is whether there is one case number or two.

We find that the double rule treats arguably indistinguishable classes of defendants differently. Thus, we must proceed to the next steps in the analysis to determine the appropriate level of scrutiny to assess to the classification and decide whether K.S.A. 2020 Supp. 21-6819(b)(4) passes that level of scrutiny.

*Does the double rule pass rational basis scrutiny?*

"Traditionally, when analyzing an equal protection claim, the United States and Kansas Supreme Courts employ three levels of scrutiny: strict scrutiny, intermediate scrutiny, and the rational basis test." *State v. Limon*, 280 Kan. 275, 283, 122 P.3d 22 (2005). The level of scrutiny applied depends on the nature of the legislative classification and the rights affected by that classification. 280 Kan. at 283.

Determining the appropriate level of scrutiny to assess to the classification is not difficult here as both parties assert that rational basis scrutiny applies, and we agree with that assessment. "'[U]nder the rational basis test, "a law is constitutional, despite some unequal classification of citizens, if the 'classification bears some reasonable relationship to a valid legislative objective.'"" *Denney*, 278 Kan. at 651.

The rational basis test is "'a very lenient standard.'" 278 Kan. at 651. "'For a statute to pass constitutional muster under the rational basis standard, it therefore must meet a two-part test: (1) It must implicate legitimate goals, and (2) the means chosen by the legislature must bear a rational relationship to those goals.'" 278 Kan. at 651. The test is only violated when the classification "'rests on grounds wholly irrelevant to the achievement of the State's legitimate objective'" and the statute will not "'be set aside if any state of facts reasonably may be conceived to justify it.'" 278 Kan. at 651-52. Dixon bears the burden of "negating "'every conceivable [reasonable] basis which might support'" the differing treatment. [Citation omitted.]" See *Cheeks*, 298 Kan. at 8.

Dixon points to relevant history of the double rule in support of his argument that the statute does not pass the rational basis test. Before 1994, the double rule applied to "a current conviction event." *McCurry*, 279 Kan. at 123; see K.S.A. 1993 Supp. 21-4720(b)(4). A "conviction event" was defined as "one or more felony convictions occurring on the same day and within a single court. These convictions may result from

41

multiple counts within an information *or from more than one information*." (Emphasis added.) K.S.A. 1993 Supp. 21-4703(c).

The term "conviction event" was removed from the statutes in 1994. See *McCurry*, 279 Kan. at 123; see also K.S.A. 1994 Supp. 21-4703. The double rule was amended to its current form, applying only so that "multiple convictions arising from multiple counts within an information, complaint or indictment cannot exceed twice the base sentence." K.S.A. 2020 Supp. 21-6819(b)(4). Thus, Dixon correctly asserts that before the amendment he would have enjoyed the benefit of the double rule even though his convictions resulted from more than one complaint or information.

The Kansas Supreme Court in *McCurry* used this amendment to find that by its plain language, the double rule does not apply to multiple cases that were consolidated for trial under K.S.A. 22-3203. 279 Kan. at 127. In doing so, it quoted a Kansas Legislative Report that explained the amendment "'was made for the purpose of "limiting the application of the 'double rule' limit for consecutive sentence[s] to multiple [counts] in the same case rather than all counts for which the defendant was convicted at one time, regardless of whether from different cases."'" 279 Kan. at 123 (quoting Kansas Report on Legislative Interim Studies, p. 116 [1994]).

Dixon acknowledges that the purpose of the double rule has a legitimate goal when it is applied to sentencing procedures regarding separate complaints containing unrelated charges or to unrelated cases that are pled to on the same day. However, he asserts that the rule has no legitimate purpose in his case when there was one trial because the charges could have been brought in one charging document, but the State declined to do so. Dixon argues the distinction is arbitrary and allows the State to manipulate the double rule—and thereby secure a harsher sentence—by charging counts that could be charged together in separate complaints while proceeding to only one trial.

42

The State asserts that Dixon's argument is essentially a challenge to prosecutorial charging discretion. The State also asserts that there is a legitimate reason for the double rule's treatment because Dixon's case involved multiple crimes against multiple victims which differs from scenarios in which multiple offenses are committed against one victim and charged in the same complaint.

As for the State's assertion of its prosecutorial charging discretion, we recognize that a prosecutor is the representative of the State in criminal prosecutions and has broad discretion in controlling those prosecutions. The scope of this discretion extends to the power to investigate and to determine who shall be prosecuted and what crimes shall be charged. *State v. Williamson*, 253 Kan. 163, 165, 853 P.2d 56 (1993) (citing *State v. Dedman*, 230 Kan. 793, 798, 640 P.2d 1266 [1982]). The discretion to decide what charges to file in any situation is an important tool reserved to the prosecutor, and courts should not try to interfere with such discretion, nor do we have the power to do so.

Still, a prosecutor's discretion is not limitless, and the doctrine of separation of powers does not prevent court intervention in appropriate circumstances. See *Alpha Med. Clinic v. Anderson*, 280 Kan. 903, 918, 128 P.3d 364 (2006); *State ex rel. Cranford v. Bishop*, 230 Kan. 799, 800-01, 640 P.2d 1271 (1982). Dixon is not arguing that the State should not be allowed to charge him with separate cases and proceed on a consolidated trial. Instead, he is arguing that if the State exercises its discretion to proceed with a consolidated trial because it could have brought the charges in one charging document, then he should receive the same sentencing benefits as if the State had charged him in one charging document. We find Dixon's argument on this point to have merit.

The State's argument that the double rule should not apply in Dixon's case because there were charges against different victims is also unpersuasive. All the charges for the crimes against the three victims here were of the same or similar character and stemmed from two or more acts or transactions constituting parts of a common scheme or plan. See

43

K.S.A. 22-3202(1). The charges could have been joined in a single complaint. In fact, the charges involving crimes against J.V. and L.D. were joined in a single amended complaint. But when the State decided to file additional charges for the crimes against K.D., the State chose to file those charges in a separate complaint. It was that arbitrary decision that ultimately increased Dixon's sentence by about 61 years.

Our independent research does not uncover any case discussing the purpose of the double rule beyond what the *McCurry* court cited. But the general policy for the Kansas Sentencing Guidelines Act (KSGA) is "uniformity in sentencing." *State v. Fowler*, 311 Kan. 136, 152, 457 P.3d 927 (2020). Applying the double rule in cases like Dixon's results in different sentences based solely on the number of charging documents.

We find it significant that under K.S.A. 2020 Supp. 21-6810(a), counts joined for trial under K.S.A. 22-3203 and amendments thereto do not count as prior convictions in determining criminal history. See *McCurry*, 279 Kan. at 125. The Kansas Legislature seems to recognize that when a defendant is convicted of charges in separate complaints that were consolidated for trial because the charges could have been brought in one charging document, it is inappropriate to count the convictions against each other in determining criminal history. But under K.S.A. 2020 Supp. 21-6819(b)(4), when a defendant is convicted of charges in separate complaints that were consolidated for trial because the charges could have been brought in one charging document, the complaints are separated again for sentencing purposes and the double rule is applied separately in each case, potentially causing an increased total sentence for the defendant.

Limiting the double rule to charges brought in a single complaint has an obvious adverse effect on a defendant like Dixon, and his case highlights the arbitrary application of the statute. The State at first charged Dixon with 4 counts for his alleged crimes against J.V. in 17CR3099. The district court held a preliminary hearing and bound Dixon over for trial on the charges. The State later added two counts for the crimes alleged

against L.D., and the State brought those charges in an amended complaint in the same case. But when the State decided to charge Dixon with four more counts for the alleged crimes against K.D., it did so by filing a separate complaint against Dixon in 18CR895. Interestingly, the district court held a joint preliminary hearing in the two cases and bound Dixon over for trial on the two amended counts involving L.D. in 17CR3099 at the same hearing it bound Dixon over for trial on the charges involving K.D. in 18CR895.

Dixon moved to sever the counts involving each victim while the State moved to consolidate the two cases for trial under K.S.A. 22-3203. The district court granted the State's motion to consolidate because all the charges could have been brought in one charging document. The consolidation of the cases provided the State with a significant procedural and strategic advantage at trial. The jury found Dixon guilty of all counts as charged except it found him guilty of the lesser offense of battery against J.V.

But although the cases were tried together, they remained separate cases for sentencing purposes. In 17CR3099, Dixon's base sentence for his primary crime of conviction was 653 months' imprisonment. The district court imposed consecutive sentences on the remaining counts in that case for a controlling felony sentence of 1,157 months' imprisonment with lifetime postrelease supervision. In 18CR895, Dixon's base sentence for his primary crime of conviction was again 653 months' imprisonment. The district court imposed consecutive sentences on the remaining counts in that case for a controlling sentence of 888 months' imprisonment with lifetime postrelease supervision. The district court ordered the sentences in the two cases to run consecutive.

Dixon points out that if the charges were all brought in one charging document, the maximum sentence would be 1,306 months (twice the base sentence of 653 months). But here, the application of the double rule led to a total sentence of 2,045 months between the two cases because Dixon had a base sentence for each case. This difference of more than 700 months, or about 61 years, is the result solely of the number of case

45

numbers attached to the charges at Dixon's consolidated trial. As Dixon argues, this disparity seems to defeat the KSGA's purpose of uniformity in sentencing.

We are mindful that the rational basis test is a very lenient standard and a statute must be enforced as written "if any state of facts reasonably may be conceived to justify it." *Denny*, 278 Kan. at 652. But we are unable to find that the strict application of K.S.A. 2020 Supp. 21-6819(b)(4) to Dixon's cases implicates any legitimate sentencing goal. As a result, we find that the statute, as applied to Dixon's cases, does not pass rational basis scrutiny. Thus, we conclude that the double rule found in K.S.A. 2020 Supp. 21-6819(b)(4), as applied to Dixon's cases, violates his equal protection rights under the Fourteenth Amendment. Our final step is to determine the remedy for the violation.

*What is the remedy for this violation?*

Dixon argues the proper remedy for the constitutional violation is not to invalidate the double rule but to instead extend the benefit of the double rule to his case. There are two remedies when a statute is under-inclusive: (1) either declare the statute void or (2) order that its benefits include the aggrieved class. *Denney*, 278 Kan. at 656. To decide between the two remedies, the court should look at the importance of the statute and the effects of striking it down. 278 Kan. at 656.

The Legislature purposely amended the statute for the purpose of """limiting the application of the 'double rule' limit for consecutive sentence[s] to multiple [counts] in the same case rather than all counts for which the defendant was convicted at one time, regardless of whether from different cases.""" *McCurry*, 279 Kan. at 123 (quoting Kansas Report on Legislative Interim Studies, p. 116 [1994]). Presumably the Legislature wanted to ensure that unrelated crimes/cases can be sentenced separately. But as discussed above, if multiple cases are consolidated because they could have been charged in one document, they are not unrelated.

46

Given the two remedies, it would be more consistent with the purpose of the KSGA to extend the coverage of the statute as opposed to striking it down. Such a remedy has been taken in other cases. See, e.g., *Denney*, 278 Kan. at 660 (extending coverage of statute to aggrieved class finding the remedy better than nullifying the statute); *State v. Kelsey*, 51 Kan. App. 2d 819, 829, 356 P.3d 414 (2015) (expanding coverage of statute to cover narrow class at issue after equal protection clause challenge).

We note that our decision does not stand for the proposition that the State must always consolidate cases for trial when they are related. Instead, our decision stands for the proposition that when the State chooses to consolidate cases for trial because the charges could have been brought in one charging document, then the State must be held to the sentencing limitations applicable to a trial based on one charging document.

To sum up, we find that the remedy for the constitutional violation identified herein is to extend the double rule to cases consolidated for trial based on a finding that the charges could have been brought in one charging document. We do not strike any language from K.S.A. 2020 Supp. 21-6819(b)(4). But for the statute to comply with the Equal Protection Clause of the Fourteenth Amendment, we hold that when two or more cases are consolidated for trial because all the charges could have been brought in one charging document, and the defendant is convicted of multiple charges at trial, the defendant shall receive the benefit of the double rule in K.S.A. 2020 Supp. 21-6819(b)(4) regardless of whether the convictions arise from multiple counts within a single information, complaint, or indictment. Based on this holding, we vacate Dixon's sentences and remand for resentencing consistent with this opinion.

Convictions affirmed, sentences vacated, and case remanded with directions.